STATE OF NORTH CAROLINA v. NATHANIEL FAIR JR.

No. 506A99

(Filed 5 October 2001)

**1. Jury— selection—peremptory challenges—racial discrimination—procedure**

The U.S. Supreme Court has established a three part test to determine whether the State impermissibly discriminated on the basis of race when selecting jurors. First, the defendant must make a prima facie showing that the State exercised a peremptory challenge on the basis of race; the burden then shifts to the State to offer a facially valid, race-neutral rationale for its peremptory challenge; and the court must then decide whether the defendant has proven purposeful discrimination. In this case, discussion of the prima facie showing was moot because the State set forth its reasons for challenging two of the prospective jurors before the court ruled on defendant's objections, and the court asked the State if it wished to give reasons for the third challenge before it ruled on the objection.

**2. Jury— selection—peremptory challenges—race-neutral rationale**

The trial court did not err in a capital first-degree murder prosecution by allowing the State to use peremptory strikes against three African-American jurors where the first clearly stated that he had long been opposed to the death penalty and related an extremely strong predisposition for a life sentence; the second excused juror made a great deal of eye contact with defendant, had visited people in prison, and her father and two uncles had been in prison; and the third worked with the Department of Correction counseling inmates on a daily basis, was familiar with a death-row inmate, had concerns about the death penalty, and had knowledge of a psychiatrist who often testified for the defense in capital sentencing hearings. These reasons provide race-neutral rationales for the peremptory challenges.

**3. Jury— selection—peremptory challenges—racial discrimination not shown**

A defendant in a capital first-degree murder prosecution did not prove purposeful discrimination in the State's exercise of

peremptory challenges where the defendant, the victim, and about one-half of the State's witnesses were African-American, the State noted during jury selection that "this case is not about race," and the trial court made no procedural errors and thoroughly considered both parties' arguments concerning the *Batson* challenges.

**4. Jury— selection—death penalty views**

The trial court did not err in a capital first-degree murder prosecution by excusing for cause three prospective jurors based on their views of the death penalty. The first juror stated unequivocally that he would not follow the trial court's instructions on the law if they were inconsistent with his own personal beliefs; the second juror repeatedly changed his mind about whether he could recommend a death sentence; and the third indicated that her strong personal feelings about the death penalty would influence her consideration of the case and that her decision might be based on factors unrelated to the evidence or the trial court's instructions.

**5. Evidence— corroboration—fact not in issue**

The trial court did not err in a capital first-degree murder prosecution by excluding testimony from the managers of two adult-oriented establishments that the victim came to their stores two or three times a month where defendant contended that the testimony would have corroborated his assertion that he met the victim in one of the stores on the night of the victim's death. Neither of the witnesses was able to testify to seeing defendant and the victim together on the night in question; moreover, where and when defendant met the victim was not a disputed fact at trial.

**6. Evidence— habit—occasional visits to store**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by determining that the victim's visits to adult-oriented businesses did not constitute relevant evidence of habit. Occasional visits to a store do not rise to the level of regular and systematic conduct.

**7. Appeal and Error— preservation of issues—basis for admission of evidence—change from trial theory**

A defendant in a capital first-degree murder prosecution did not preserve for appeal the issue of whether the victim's visits to

adult-oriented businesses constituted admissible character evidence because he stated in no uncertain terms at trial that the proffered testimony was not character evidence. Defendant's change in position runs afoul of Appellate Rule 10.

**8. Criminal Law-prosecutors's argument— reversal of voir dire assertion**

The trial court did not err in a capital prosecution for first-degree murder by not intervening ex mero motu during the State's closing argument regarding defendant's account of meeting the victim in an adult video store. Even though the State asserted on voir dire that it did not contest how or where defendant met the victim and then attacked defendant's credibility in its closing argument by questioning defendant's account of how he met the victim, the State's argument was not so grossly improper as to warrant a new trial.

**9. Constitutional Law— defendant's silence—cross-examination—admissible**

The trial court did not err in a capital prosecution for first-degree murder by allowing the State to cross-examine defendant about his failure to tell the police about a witness who could have backed up his story, about his failure to tell a journalist about the person who allegedly committed the crime, and about statements made to an officer while in a holding cell. Defendant's objection to the first set of questions was sustained, the State asked defendant no questions concerning silence during cross-examination about his holding cell statements, and it would have been natural for defendant to reveal the identity of the real killer when he voluntarily spoke to the press.

**10. Criminal Law— prosecutor's argument—defendant's silence**

The trial court did not err in a capital prosecution for first-degree murder by refusing to instruct the jury to disregard the State's closing argument that the jury could decide not to believe defendant's trial testimony based on his silence about evidence that another person committed the crime when he was speaking to the media. A defendant who chooses to testify is subject to impeachment when his earlier silence is inconsistent with his testimony on the stand.

**11. Evidence— expert testimony—basis—hearsay**

The trial court did not err in a capital prosecution for first-degree murder by allowing an SBI DNA expert to base her testimony in part on bloodstained cloth samples taken by another agent who was unable to testify where the expert examined the pants from which the samples were taken to determine whether the cuttings were from the areas indicated by the other agent's notes. The cuttings and the pants were admitted into evidence, so that defendant was able to cross-examine the expert fully concerning the original location of the blood samples and was free to conduct his own tests, and the jury was free to make its own determination.

**12. Sentencing— capital—statutory mitigating circumstances**

In a capital sentencing proceeding, the trial court is required to submit statutory mitigating circumstances to the jury if they are supported by the evidence even when defendant objects. If a jury finds that a statutory mitigating circumstance exists, it must consider that circumstance in its final sentence determination.

**13. Sentencing— capital—mitigating circumstance—emotional disturbance—drug use and depression—evidence insufficient**

Evidence of drug use did not warrant submission of the mental or emotional disturbance mitigating circumstance in a capital sentencing proceeding because voluntary intoxication alone is not sufficient. Although defendant argued that he was depressed, there was no testimony that he had been medically diagnosed as suffering from depression. Moreover, the mere fact that he was depressed or suffering a family crisis prior to the murder does not warrant submission of this mitigator where there is not substantial evidence that he was depressed or in crisis at the time he killed the victim.

**14. Sentencing— capital—mitigating circumstance—impaired capacity—drug use—insufficient link to crime**

There was insufficient evidence in a capital sentencing proceeding to support submission of the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance of impaired capacity to appreciate the criminality of conduct where defendant relied upon his extensive and continuous drug use. Although drug use can support this mitigator, defendant here did not show a link between his drug use

and his allegedly impaired capacity at the time of the murder. His search for drugs that night at most reveals a motive.

## 15. Constitutional Law—ineffective assistance of counsel— procedure for raising

Ineffective assistance of counsel (IAC) claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required. IAC claims prematurely asserted on direct appeals will be dismissed without prejudice to defendant's right to reassert them during a subsequent motion for appropriate relief (MAR) proceeding. When an IAC claim is raised on direct appeal, defendants are not required to file a separate MAR in the appellate court during the pendency of that appeal.

## 16. Constitutional Law— ineffective assistance of counsel— attorney conduct not unreasonable

A capital first-degree murder defendant who alleged ineffective assistance of counsel failed to show that his attorney's conduct rose to the level of unreasonableness or prejudiced defendant's trial where defendant pointed to an admission elicited as a matter of reasoned trial strategy, the failure to object to cross-examination about communications with his attorney which were not privileged, the failure to object to the proper impeachment of defendant with his post-arrest silence, the failure to object to closing arguments which were not grossly improper or prejudicial, and the request to submit statutory mitigating circumstances as nonstatutory circumstances when the evidence of the circumstances was not sufficient.

## 17. Sentencing— capital—death penalty—not disproportionate

A death penalty was not disproportionate where defendant repeatedly stabbed his victim; stole the man's wallet, money, jewelry, and car; left the man to die; went on a shopping spree with the man's credit cards; was convicted on the basis of premeditation and deliberation; and the jury found three of the four aggravating circumstances which can sustain a death sentence standing alone.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Bullock, J., on 18 May 1999 in Superior Court, Wake County, upon a jury verdict finding defendant guilty of first-degree murder. On 13 August 2001, the

**STATE v. FAIR**

[354 N.C. 131 (2001)]

Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 19 April 2001.

*Roy A. Cooper, Attorney General, by Jill Ledford Cheek, Special Deputy Attorney General, and Steven F. Bryant, Assistant Attorney General, for the State.*

*Thomas K. Maher for defendant-appellant.*

MARTIN, Justice.

On 12 May 1999, a jury found Nathaniel Fair, Jr. (defendant) guilty of robbery with a dangerous weapon and the first-degree murder of Reubin McNeill (victim) on the basis of malice, premeditation, and deliberation, and under the felony murder rule. On 18 May 1999, the jury recommended a sentence of death, and the trial court entered judgment in accordance with that recommendation. The trial court also sentenced defendant to 94-122 months in prison for the robbery conviction.

The victim's body was found near a vacant lot off Wilcox Road in Wake County, North Carolina, on 6 August 1998. The victim, a middle school principal within the Wake County Public School System, had not been seen alive since 4 August 1998, when he left his residence around 6:00 p.m. to attend a church meeting. He had been carrying a wallet with credit cards in his back left pocket, wearing a silver class ring with a burgundy stone, and driving a green Ford Explorer. After the church meeting ended between 8:15 and 8:30 p.m., the victim spoke briefly with some choir members and then left. When the victim had not arrived home by 11:00 p.m., his wife began to call his cell phone. Early the next morning, she called the police.

On 6 August 1998, around 1:30 p.m., a Carolina Power and Light employee found the victim's body and called 911. Law enforcement officers and paramedics who responded to the scene described the victim's clothing as extremely bloody. The victim was wearing a watch but no other jewelry. The authorities found no wallet or money on the victim. The inner lining of the victim's left rear pocket was flipped over the top of his pants, with a bloodstain appearing on the pocket lining.

Around 9:30 p.m. on 6 August 1998, police located the victim's car at Crabtree Valley Mall. They found a stained gauze bandage inside the truck, and the City-County Bureau of Investigation (CCBI) noted

blood on the driver's door, steering wheel, and console area. CCBI found defendant's prints on the truck's left front door, rear hatch, and the cell phone on the console.

On 5 August, around 1:00 a.m., defendant approached the home of Tony Lucas in a green Ford Explorer. Defendant had a deep cut on his hand and blood on his clothes. Defendant refused to go to the doctor and instead bandaged the cut himself with duct tape. Lucas testified that when defendant cut the tape for the bandage, defendant produced a knife with blood on it. Defendant stated that his hand had been cut when he was jumped by three men.

Defendant changed clothes while at the Lucas residence and then went to buy beer with Lucas and another individual. During the drive Lucas noticed blood on the Explorer's steering wheel. An employee from Handy Hugo convenience store testified defendant had purchased gas that night for a green Explorer. Defendant paid for the gas with a credit card and signed the credit card slip as "Reubin McNeill." The Handy Hugo employee recalled that defendant was wearing a class ring with a stone which may have been reddish in color. At some point during the evening, defendant told Lucas' sister, Carolyn, that he was in trouble and that she would not see him again.

Several employees at Crabtree Valley Mall testified that on 5 August, a man fitting defendant's general description had purchased items with credit cards bearing the name Reubin McNeill. At least two of these employees, Ted Murphy from Brookstone and Penny Franklin from Sharon Luggage and Gifts, identified defendant as the man who made the purchases on 5 August.

Haywood McCoy testified that defendant had asked him to retrieve luggage from an Explorer parked in the Crabtree Valley Mall parking lot. Defendant told McCoy he had left the vehicle there because he had the feeling the police were watching him when he left the mall after shopping. Defendant also told McCoy the items in the Explorer were the only evidence that could tie him to a crime in which "he had cut somebody up." McCoy testified he could not locate the Explorer in the parking lot.

Defendant was arrested on 13 August 1998 at an apartment in Durham, North Carolina. As police approached, defendant raised his hands in the air, dropping some cards in the process. Police found a driver's license and various credit cards bearing Reubin McNeill's

name near defendant. At that time, defendant told the police, "those aren't mine." Police also found a purple card bearing the name "Tank" and a pager number.

The state presented DNA evidence at trial via State Bureau of Investigation (SBI) Special Agent Brenda Bissette. Bissette testified that a DNA profile taken from three samples of the victim's pants matched defendant's DNA. On a piece taken from the inside of the victim's pocket, defendant's DNA was dominant. Finally, Bissette testified that the DNA of both the victim and defendant appeared in samples taken from the Explorer.

Dr. Thomas Clark, a pathologist, performed an autopsy on the victim's body. In addition to multiple superficial wounds, the autopsy revealed a stab wound that entered the victim's lung and caused bleeding in the chest cavity. The autopsy also identified a group of wounds that entered the heart. According to Dr. Clark, the cause of death was multiple stab wounds.

Defendant testified on his own behalf. He stated that after graduating from high school, he had pled guilty to a rape charge, received a life sentence, and served prison time in South Carolina. Defendant was paroled in 1993 and eventually attended Fayetteville State and North Carolina State Universities. According to defendant, in November 1997, he began using crack cocaine and never stopped. Defendant testified he purchased crack cocaine from people known on the street as "Tank" and "T-Bone." In one transaction, defendant obtained $600.00 of cocaine from T-Bone and never paid for it. Defendant testified T-Bone had once shot out defendant's car windshield and tried to attack him because defendant owed him money. Defendant reported this incident to the police.

Defendant testified he first met the victim in 1996 at Snap Shot Video, an adult video establishment. Defendant also testified he had encountered the victim on 4 August 1998 in an adult-oriented establishment where defendant was smoking crack cocaine. Defendant and the victim left in the victim's car. The two men drank a beer together at a restaurant and discussed engaging in some sort of sexual conduct with each other. Defendant decided, "I wasn't going to have any sex with him or get with him or anything like that unless I got some drugs." Defendant and the victim drove to Shepherd Street, where defendant bought three rocks of cocaine from "Tank." Tank made a phone call to obtain more cocaine for defendant, and directed defendant to drive to the spot where the victim's body was eventually

found. Defendant testified that Tank told him to wait there about fifteen minutes for more drugs.

According to defendant, after they arrived at the spot, a car pulled up, and defendant and the victim exited the Explorer. Defendant recognized the man in the other car as T-Bone. Defendant testified that T-Bone demanded the money defendant owed him and brandished a knife in front of defendant's face. Defendant grabbed the knife and T-Bone shoved defendant into the front of the victim's truck. Defendant then grabbed T-Bone's knife by the blade. After continued brawling, the victim eventually pulled T-Bone off of defendant. According to defendant, T-Bone stabbed the victim, and they fell down. Defendant then fled in the victim's Ford Explorer to Carol and Tony Lucas' house.

Defendant denied bringing a knife to the Lucas home but admitted using the victim's credit cards. Defendant stated he left the Explorer at Crabtree Valley Mall because when he left the mall, he saw a police officer in an unmarked car with a radio in his hand. Defendant also admitted he asked McCoy to try to retrieve items from the Explorer but denied telling McCoy he had "cut anybody up real bad."

## JURY SELECTION

[1] Defendant first argues that the trial court, by allowing the state to use peremptory strikes against three African-American jurors, violated his right to equal protection under the state and federal Constitutions, U.S. Const. amend. XIV, N.C. Const. art. I, § 26; his right to fair and equal jury selection under the North Carolina Constitution, N.C. Const. art. I, §§ 19, 26; and his Sixth Amendment right to a representative jury from a cross-section of the community, U.S. Const. amend. VI.

The use of peremptory challenges for racially discriminatory reasons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986), as well as Article I, Section 26 of the North Carolina Constitution, *State v. Fletcher*, 348 N.C. 292, 312, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999).

In *Batson*, the U.S. Supreme Court established a three-part test to determine whether the state had impermissibly discriminated on the basis of race when selecting jurors. 476 U.S. at 96-98, 90 L. Ed. 2d

at 87-89. Our courts have adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution. *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001); *State v. Mitchell*, 321 N.C. 650, 365 S.E.2d 554 (1988). First, the defendant must make a *prima facie* showing that the state exercised a peremptory challenge on the basis of race. *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 815. If this showing is made, the court advances to the second step, where the burden shifts to the state to offer a facially valid, race-neutral rationale for its peremptory challenge. *Id.* The state's explanation must be clear and reasonably specific, although it "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, *quoted in Lawrence*, 352 N.C. at 14, 530 S.E.2d at 815. Moreover, the state's proffered rationale need not be persuasive or even plausible. *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 816. As long as the state's reason appears facially valid and betrays no inherent discriminatory intent, the reason is deemed race-neutral. *Id.* Our courts allow the defendant to submit evidence to show that the state's proffered reason is merely a pretext for discrimination. *Id.*

In the third and final step, the trial court must decide whether the defendant has proven purposeful discrimination. *Id.* This involves weighing various factors such as " 'susceptibility of the particular case to racial discrimination, whether the State used all of its peremptory challenges, the race of witnesses in the case, questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, and whether the State has accepted any African-American jurors.' " *State v. Golphin*, 352 N.C. 364, 427, 533 S.E.2d 168, 211 (2000) (quoting *State v. White*, 349 N.C. 535, 548-49, 508 S.E.2d 253, 262 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999)), *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 305 (2001).

Upon review, the trial court's determination is given great deference because it is based primarily on evaluations of credibility. *Id.* Such determinations will be upheld as long as the decision is not clearly erroneous. *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 816.

Where the trial court fails to rule on a peremptory challenge, "the question of whether the defendant established a *prima facie* case becomes moot." *Golphin*, 352 N.C. at 426, 533 S.E.2d at 211. In the absence of an express ruling, " 'we need not address the question of whether defendant met his initial burden of showing discrimination[,] and [we] may proceed as if a *prima facie* case had been estab-

lished.'" *State v. Bonnett*, 348 N.C. 417, 434, 502 S.E.2d 563, 575 (1998) (quoting *State v. Harden*, 344 N.C. 542, 557, 476 S.E.2d 658, 665 (1996), *cert. denied*, 520 U.S. 1147, 137 L. Ed. 2d 483 (1997)), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999). Similarly, the reviewing court may proceed with its analysis under *Batson* and its progeny where the state presents reasons for its challenges despite the defendant's failure to establish a *prima facie* case. *State v. Smith*, 352 N.C. 531, 532 S.E.2d 773 (2000), *cert. denied*, —— U.S.——, 149 L. Ed. 2d 360 (2001).

In the present case, defendant argues that prospective jurors Rotini, Sanders, and Vann were improperly excluded from the jury on the basis of race. The state set forth its reasons for challenging prospective juror Rotini before the trial court ruled on defendant's objection. The state did the same with prospective juror Sanders. The trial court also did not immediately rule on defendant's objection to prospective juror Vann but instead asked the state if it wished to give reasons for the challenge. For these reasons, discussion of defendant's *prima facie* case is moot. *Golphin*, 352 N.C. at 426, 533 S.E.2d at 211; *Smith*, 352 N.C. 531, 532 S.E.2d 773. We therefore move to the second prong of the *Batson* test and determine whether the state met its burden of providing race-neutral reasons for its peremptory challenges. *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 815.

[2] We first address the state's proffered rationale for its challenge to prospective juror Rotini. At the time the state challenged that prospective juror, it had already used two peremptory challenges, one on a white male and the second on an Hispanic female. Furthermore, at that point in jury selection, the state had already accepted the first African-American juror it questioned. The state argued that its acceptance of the first African-American juror not excused for cause was proof the state was not engaging in any pattern or practice in exercising its peremptory challenges. Further, the state argued that prospective juror Rotini's views on the death penalty prompted the state's peremptory challenge. Our review of prospective juror Rotini's *voir dire* reveals the state's rationale was valid. Prospective juror Rotini clearly stated he had long been opposed to the death penalty and was not capable of taking someone else's life. Moreover, the juror related an extremely strong predisposition for a life sentence rather than death if he were selected for the jury. Accordingly, the trial court did not err in finding the state had provided a race-neutral reason to challenge prospective juror Rotini.

Turning to prospective juror Sanders, the state argued that its challenge of Sanders was supported by her eye contact with defendant, her history of visiting prisons, and her close family members having spent time in prison. All these facts, according to the state, indicated Sanders' potential sympathy for defendant. A thorough review of the transcript reveals the state's excusal of Sanders was unrelated to race. As the state argued to the trial court, the record of prospective juror Sanders' *voir dire* indicates that the juror made a great deal of eye contact with defendant, that she had visited people in prison, and that her father and two uncles had been in prison. Accordingly, the trial court properly concluded that the state had articulated a race-neutral rationale for its peremptory challenge.

Finally, we consider the state's peremptory challenge of prospective juror Vann. The state listed the following reasons in support of its peremptory challenge of this prospective juror: his employment with the Department of Correction, which involved counseling inmates on a daily basis; his statements indicating real concerns about the death penalty; his familiarity with a death-row inmate; and his knowledge of a psychiatrist who often testified for the defense in capital sentencing hearings. The record indicates that the state's reasons for its peremptory challenge are supported by the witness' *voir dire* testimony. Moreover, these reasons provide a facially valid and race-neutral rationale for this peremptory challenge. Accordingly, the trial court properly found the state's rationale for its peremptory challenge of prospective juror Vann to be race-neutral.

[3] Because the state provided race-neutral reasons for its peremptory challenges of prospective jurors Rotini, Sanders, and Vann, we now proceed to the third prong of the *Batson* inquiry. In this inquiry, we evaluate whether defendant proved purposeful discrimination by applying the factors listed in *Golphin*, 352 N.C. at 427, 533 S.E.2d at 211. First, we note that defendant, the victim, and approximately one-half of the state's witnesses were African-American. This made the jury selection process less likely to be susceptible to racial discrimination. *White*, 349 N.C. at 550, 508 S.E.2d at 262. Moreover, the state noted during jury selection that "this case is not about race." This statement tends to refute an inference of discrimination. *Id.* at 548-49, 508 S.E.2d at 262. Additionally, the record indicates that the trial court made no procedural errors but instead thoroughly considered both parties' arguments concerning the *Batson* challenges before allowing the state's peremptory challenges of the three jurors.

STATE v. FAIR

[354 N.C. 131 (2001)]

Finally, the record reveals that the state accepted two African-Americans to serve on defendant's jury. *Id.*

According the required level of deference to the trial court in its credibility determinations, *Golphin*, 352 N.C. at 427, 533 S.E.2d at 211, and noting that a showing of clear error was not made, *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 816, we hold the record reveals no evidence of purposeful discrimination by the state in exercising its peremptory challenges of prospective jurors Rotini, Sanders, and Vann. Jury selection in this case complied in all respects with *Batson*. For the same reasons, there is no violation of defendant's right to fair and equal jury selection under the North Carolina Constitution or of his Sixth Amendment right to a representative jury from a cross-section of the community. Defendant's assignments of error are without merit.

[4] Defendant also assigns error to the trial court's excusal for cause of prospective jurors Neal, Cooke, and Baker because of their views on the death penalty. Defendant argues that the state challenged these three jurors merely because their answers were equivocal and that these dismissals violated the Sixth and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments prohibit exclusion of jurors in capital cases merely because they have reservations about the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 517-18, 20 L. Ed. 2d 776, 782-83 (1968); *see also State v. Gregory*, 340 N.C. 365, 459 S.E.2d 638 (1995) (finding no error where prospective jurors were excused for cause because they demonstrated they would be unable to put aside their own opinions and follow the law), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Capital jurors, however, must be impartial about finding the facts and applying the law. *Wainwright v. Witt*, 469 U.S. 412, 416, 83 L. Ed. 2d 841, 846-47 (1985). Jurors who are unable to articulate clearly their willingness to set aside their own beliefs on capital punishment and defer to the law may be excused for cause. *State v. Blakeney*, 352 N.C. 287, 299, 531 S.E.2d 799, 809-10 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001); *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993). The holding in *Wainwright* established that it was proper to exclude a juror where his or her views on the death penalty would

"prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." [*Adams*

*v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980).] We note that . . . this standard . . . does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

469 U.S. at 424-26, 83 L. Ed. 2d at 851-53 (footnotes omitted). Accordingly, in analyzing this issue, we will not disturb the trial court's decision in the absence of an abuse of discretion. *State v. Hill*, 347 N.C. 275, 288, 493 S.E.2d 264, 271 (1997), *cert. denied*, 523 U.S. 1142, 140 L. Ed. 2d 1099 (1998).

Turning first to prospective juror Neal, the record reveals Neal stated unequivocally that he would not follow the trial court's instructions on the law if they were inconsistent with his own personal beliefs. Neal indicated he would adhere to a standard of "zero doubt" rather than "reasonable doubt" and that he would not change his decision-making in accordance with the trial court's instructions:

[Q] Okay. Let me talk to you a little bit about the burden of proof. The State is held to a burden of proof beyond a reasonable doubt throughout the trial. Throughout both phases of the trial. Nothing more, nothing less than that. Judge Bullock will define what reasonable doubt is for you, and that is the standard that each and every juror must follow. Again, not any preconceived notions about what reasonable doubt is, and he will continue to refer to it as reasonable doubt, not beyond a shadow of a doubt, not beyond all doubt, or not anything lesser than beyond a reasonable doubt. Given your feelings about this, do you think that you can hold the State to that burden, nothing more and nothing less?

[A] I would find it very difficult. It would have to be proven in my definition of reasonable doubt. To the point that reasonable was almost to the point of zero, almost.

[Q] Okay.

[A] Meaning zero to almost zero doubt. The evidence would have to be so heavily weighted on that there was [sic], in effect, in my mind, be almost no doubt.

[Q] Okay. In your mind. And that's what we're talking about here, what it would be in your mind. So you are saying, then, to me, and correct me if I'm wrong. Okay? Because I am not trying to put words in your mouth, I am just trying to understand here. But what you are saying is that you would have to be one hundred percent certain that it wouldn't make any difference to you in your mind what the instruction on reasonable doubt is, that you would have to be one hundred percent certain before you could vote or before you could recommend a sentence of death?

[DEFENSE COUNSEL]:

Objection.

BY THE COURT:

Sustained.

[Q] Let me rephrase that. Would you be able to set aside what your definition of reasonable doubt is and apply the standard that Judge Bullock gives you?

[A] I'll have to think about this one just a minute.

[Q] Please, yes. Take your time.

[A] Reasonable doubt in my mind is my own feeling, my own principles. And if reasonable doubt is not defined to match my principles in this Court or any Court, then I will not violate my principles to adhere to what the Court says.

Following this discussion, defendant requested, outside the juror's presence, that the trial court instruct the juror on reasonable doubt. The trial court declined to give such an instruction, stating that it was more interested in whether the juror would "follow the law that's given to him and not as what he thinks it is." When prospective juror Neal was brought back in for further questioning, he reiter-

ated that he would follow his personal beliefs rather than the law if the law differed from his own beliefs.

The comments of prospective juror Neal make it abundantly clear he was unwilling " 'to temporarily set aside [his] own beliefs in deference to the rule of law.' " *Brogden*, 334 N.C. at 43, 430 S.E.2d at 907-08 (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986)). Accordingly, the trial court did not abuse its discretion in allowing the state's motion to excuse Neal for cause. *See id.* at 43, 430 S.E.2d at 908; *see also Blakeney*, 352 N.C. at 299-301, 531 S.E.2d at 810-11 (holding juror excusal was proper where jurors stated that their strong personal beliefs would not allow them to vote for the death penalty under any circumstances).

We next consider the excusal for cause of prospective juror Cooke. After extensive *voir dire* of Cooke, his ability to recommend the death penalty remained unclear. Prospective juror Cooke initially told the state he could impose the death penalty if defendant "deserved to die." After further inquiry from the state, he admitted, "I don't think I can [recommend the death penalty]." When the state asked if his beliefs were so strong he could not vote for the death penalty under any circumstances, prospective juror Cooke stated, "I could give the death penalty if I thought it was right." Finally, after conceding he was "going back and forth," prospective juror Cooke agreed with the state that, if he served on the jury, he would hold the state to a higher burden of proof concerning the death penalty and that he could not follow the trial court's instructions on that phase of the proceeding.

Defendant and the trial court then examined prospective juror Cooke. Cooke continued to vacillate concerning his position on the death penalty and admitted he was confused. He eventually informed the trial court that he could vote for the death penalty under certain circumstances. At this point, the trial court denied the motion to dismiss Cooke for cause.

Upon further questioning by the state, however, prospective juror Cooke repeated his assertion that he would require a higher burden of proof during the sentencing proceeding than "beyond a reasonable doubt." The prospective juror also stated again that he could not recommend defendant be put to death under any circumstances. After the state renewed its challenge to prospective juror Cooke and defendant requested further *voir dire*, the trial court concluded, "[T]his juror's views would prevent or substantially impair the

performance of his jury duties, as a juror in a Court with his instructions and his oath. The Court, in its discretion, will not allow further questions about the subject and allow[s] the State's challenge for cause."

Cooke's bias for or against the death penalty was by no means illuminated with unmistakable clarity. *See State v. Morganherring*, 350 N.C. 701, 726, 517 S.E.2d 622, 637 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000). Cooke repeatedly changed his mind about whether he could recommend a death sentence. In a case such as this, where a juror's remarks concerning the death penalty are so equivocal that a court, either in *voir dire* or upon review, cannot discern whether the juror would be able to properly apply the law, deference must be given to the trial court's decision. *Id.* at 727, 517 S.E.2d at 637. Moreover, because prospective juror Cooke indicated he would not follow the trial court's instructions concerning sentencing and would instead apply a higher standard than beyond a reasonable doubt, there is ample evidence to support the trial court's decision to excuse him for cause.

Finally, we consider the trial court's excusal for cause of prospective juror Baker. She agreed during *voir dire* that she already had set ideas about when the death penalty was appropriate. The state investigated whether these ideas would interfere with Baker's duties as a juror:

[Q] I know and, again, I have to talk in such generalities. But as I understood you, you indicated that if you had to say yes or no, that these strong feelings you have, some of them are strong, you could not set them aside?

[A] True. It depends on evidence and all.

. . . .

[Q] When you say that you could not set those strong feelings aside, you can't say right now that you could set them aside because it would depend on what the evidence would, in fact, show?

[A] Correct.

[Q] And that there would be instances where the evidence would be such that you could set them aside, maybe, or there could be some circumstances, based on the evidence, that you couldn't set them aside; is that fair? Or do you think those

strong feelings would always be a part of you and would affect your ability—

[A] They would always be a part of me and would probably affect (pause)—

[Q] Okay. And because of those feelings, they would, in fact, affect decisions that you would make. And it would, in fact, affect your making decisions about this Defendant for having committed whatever crime it is the jury decides he committed, whatever kind of first-degree murder. But it would affect your ability to make decisions in the case because of your strong feelings?

[DEFENSE COUNSEL]:

Objection.

[A] Yes.

BY THE COURT:

Overruled.

[Q] And you can answer. And since it would affect the decisions that you would make, does that mean that you might possibly find yourself making a decision[] in this case, based on or influenced by something other than the evidence that's presented and the law that Judge Bullock gives?

[A] It could be possible.

After this exchange, the trial court allowed the state's motion to excuse prospective juror Baker for cause. Prospective juror Baker had indicated that her strong personal feelings about the death penalty would influence her consideration of the case. *See Morganherring*, 350 N.C. at 727, 517 S.E.2d at 637. Moreover, the prospective juror stated that her decision-making in the case might be based on factors unrelated to the evidence or the trial court's instructions. Because this prospective juror clearly indicated that her personal feelings would "substantially impair the performance of h[er] duties as a juror," *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851, she was properly dismissed for cause. The trial court did not abuse its discretion in excluding the challenged prospective jurors. This argument is without merit.

## GUILT-INNOCENCE PHASE

**[5]** Defendant next assigns error to the trial court's exclusion of the testimony of the managers of two adult-oriented establishments. Glenn Moore, store manager of Our Place Video, testified on *voir dire* that the victim visited his establishment two to three times per month. Catherine Keith testified on *voir dire* that the victim would come to Snap Shot Video, where she worked, twice a month. Defendant argued for the admission of this evidence at trial on the theory that it bolstered his credibility by corroborating his assertion that he met the victim at Our Place Video on the night of the victim's death.

Defendant argued on *voir dire* that the testimony was admissible as relevant evidence of habit. The state asserted that the witnesses' statements were irrelevant because the witnesses could not testify they saw defendant and the victim together at Our Place Video on the night in question. The trial court stated that it would have allowed defendant's evidence for corroborative purposes had either of the witnesses been able to testify to seeing defendant and the victim together on the night in question. The trial court excluded the evidence on relevancy grounds, however, finding that the frequency with which the victim visited these establishments was immaterial to the issues for trial.

Defendant alleges that the exclusion of this evidence violated his constitutional right to present a defense. Specifically, defendant asserts that his due process right to present evidence under both the state and federal Constitutions, as well as the North Carolina Rules of Evidence, was violated by the trial court's exclusion of the challenged testimony. On appeal, defendant characterizes the testimony of these two witnesses as relevant and admissible to show the habitual practices of, as well as the character of, the victim.

The right to present evidence in one's own defense is protected under both the United States and North Carolina Constitutions. As noted by the United States Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297 (1973), "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id.* at 294, 35 L. Ed. 2d at 308.

Like all evidence offered at trial, however, evidence offered to support a defense must be relevant to be admissible. N.C.G.S. § 8C-1, Rule 402 (1999). Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). The jury should not be prohibited from hearing evidence that is "in any way connected with the matter in issue" or evidence "from which any inference of the disputed fact can reasonably be drawn." *State v. McCraw*, 300 N.C. 610, 618-19, 268 S.E.2d 173, 178 (1980); *see also State v. York*, 347 N.C. 79, 95, 489 S.E.2d 380, 389 (1997) (holding that testimony regarding letter written by the defendant's cellmate allegedly illustrating the codefendant's "manipulative hold" over the defendant was not relevant because it did not go to "prove the existence of any fact . . . of consequence in the determination of the charge of murder for which defendant was found guilty"). Relevant evidence may be excluded, however, when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1999).

In *Chambers*, the defendant's conviction was reversed because the trial court erroneously excluded testimony of three witnesses that would have corroborated self-incriminating statements made by another suspect. 410 U.S. at 292-93, 35 L. Ed. 2d at 307-08. In the instant case, however, the excluded testimony was not offered to challenge the identity of defendant as the true perpetrator. *See id.* Rather, it was offered to corroborate defendant's statement that he met the victim at an adult-oriented establishment on 4 August 1998. Whether defendant was with the victim on the night the victim was killed, however, was not a matter at issue in this case. *See McCraw*, 300 N.C. at 618-19, 268 S.E.2d at 179. That issue was effectively mooted by defendant's own admission that he spent time with the victim on the night of 4 August. Similarly, where and at what time defendant met the victim was not a disputed fact at trial. *See id.* Even if it had been a disputed fact, neither of the witnesses could have shed light on that issue because neither of them could testify to seeing defendant and the victim together on the night of 4 August 1998. In any event, the evidence offered by the two witnesses was collateral, or immaterial, to any disputed issue in the case. *See York*, 347 N.C. at 95, 489 S.E.2d at 389; 1 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 3 n.22 (5th ed. 1998) (noting that in

prior editions Dean Brandis defined immateriality as follows: "*Immaterial* is properly used to describe evidence which, though relevant in some degree, is of such slight probative value that to exclude it is not error."); *see also* N.C.G.S. § 8C-1, Rule 403. Accordingly, the trial court did not err in excluding the challenged evidence on relevancy grounds.

**[6]** Defendant's arguments pertaining to habit evidence deserve mention, as habit evidence is a subcategory of the relevance inquiry. Evidence of habit is relevant to prove that "the conduct of the person . . . on a particular occasion was in conformity" therewith. N.C.G.S. § 8C-1, Rule 406 (1999). In determining whether a practice constitutes habit, a court must weigh, on a case-by-case basis, the number of specific instances of the behavior, the regularity of the behavior, and the similarity of the behavior. *Crawford v. Fayez*, 112 N.C. App. 328, 335, 435 S.E.2d 545, 550 (1993), *disc. rev. denied*, 335 N.C. 553, 441 S.E.2d 113 (1994). To rise to the level of habit, the instances of specific conduct must be "sufficiently numerous to warrant an inference of systematic conduct and to establish one's regular response to a repeated specific situation." *Id.*; *see also State v. Palmer*, 334 N.C. 104, 112, 431 S.E.2d 172, 176 (1993) (holding that the custom of always having money on one's person constituted a regular response to a repeated specific situation and was therefore habit). The trial court's ruling on the admissibility of habit evidence may be disturbed only for an abuse of discretion. *Crawford*, 112 N.C. App. at 335, 435 S.E.2d at 550.

Defendant contends the testimony excluded in this case tended to show the victim had a habit of frequenting adult-oriented establishments. The two witnesses who testified on *voir dire* indicated that the victim visited each of their stores two or three times each month. Occasional visits to a store do not rise to the level of regular and systematic conduct. *Id.* The trial court therefore did not abuse its discretion in determining that the challenged testimony did not constitute relevant evidence of habit. *See id.*

**[7]** Defendant also characterizes the excluded testimony as admissible character evidence. At trial, however, defendant's counsel did not argue that this testimony was character evidence. In fact, the defense stated on *voir dire*, "[W]e have asked no questions and have elicited no evidence, and intend not to elicit any evidence from either of these witnesses as to any trait of [the victim's] character." Nonetheless, in the instant appeal, defendant argues that the testi-

mony of Moore and Keith should have been allowed as relevant evidence of the character of the victim.

Rule 10 of the North Carolina Rules of Appellate Procedure requires that, "[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired." N.C. R. App. P. 10(b)(1). Rule 10 has been interpreted by this Court to stand for the proposition that "[w]here . . . a defendant withdraws challenged questions, we do not find that the court's ruling on those questions has been preserved for review. The defendant abandoned his position at trial and cannot now resume the battle in this forum." *State v. Larrimore*, 340 N.C. 119, 149, 456 S.E.2d 789, 805 (1995); *see also Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934) (noting that "[a]n examination of the record discloses that the cause was not tried upon [the defendant's] theory, and the law does not permit parties to swap horses between courts in order to get a better mount in the Supreme Court").

While defendant stated in no uncertain terms at trial that the evidence proffered was not character evidence, he now seeks to establish error on appeal by asserting that the evidence was indeed character evidence. Defendant's change in position runs afoul of the specificity required by Rule 10 for preservation of error. N.C. R. App. P. 10; *Larrimore*, 340 N.C. at 149, 456 S.E.2d at 805. Accordingly, this question is not before us for review.

[8] In his next argument, defendant contends the trial court erred by failing to intervene *ex mero motu* during the state's closing argument to prevent the state from challenging defendant's account of his meeting with the victim in the adult video store. On *voir dire*, the state had objected to the testimony of witnesses Moore and Keith, arguing that it was not relevant. As further basis for its objection, the state argued that it had not cross-examined defendant about that issue and that there was "no contest" about when and where defendant met the victim. The trial court heard further argument by defendant for admission of the testimony as habit evidence, but finally ruled that the testimony of Moore and Keith was irrelevant and therefore inadmissible. The state in closing argument challenged defendant's credibility, stating:

> There will certainly be questions in your mind as to how all of this came about. How did Reubin McNeill come to be with the Defendant that night? We don't know enough of the evi-

dence, because the only living person who can tell us about that simply isn't telling the truth about so many other things. How they met that night is only uncontroverted, if you believe the Defendant.

Defendant did not object, and the trial court did not intervene. Defendant now argues that the trial court's failure to intervene *ex mero motu* violated his due process right to a fair trial.

Trial counsel are allowed wide latitude in their arguments to the jury in capital proceedings. *State v. Smith*, 351 N.C. 251, 268, 524 S.E.2d 28, 41, *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000); *State v. Robinson*, 346 N.C. 586, 606, 488 S.E.2d 174, 187 (1997). Counsel may argue the facts in evidence as well as all reasonable inferences that may be drawn therefrom. *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999). In the absence of an objection by the opposing party, the trial court is obligated to intervene to prevent a closing argument only where the argument is so grossly improper that it impedes the defendant's right to a fair trial. *Golphin*, 352 N.C. at 452, 533 S.E.2d at 226; *State v. Roseboro*, 351 N.C. 536, 546, 528 S.E.2d 1, 8, *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498 (2000). Grossly improper argument is defined as conduct so extreme that it renders a trial fundamentally unfair and denies the defendant due process. *See, e.g., Taylor v. Kentucky*, 436 U.S. 478, 487, 56 L. Ed. 2d 468, 477 (1978) (holding that defendant's right to due process was violated where court refused to give jury instructions on presumption of innocence after state's closing argument implied that all defendants are guilty); *Miller v. Pate*, 386 U.S. 1, 6-7, 17 L. Ed. 2d 690, 694 (1967) (holding that the defendant's due process rights were violated where prosecutor's argument intentionally misrepresented the evidence).

In the instant case, the state asserted on *voir dire* that it did not contest how or where defendant met the victim. Contrary to this representation, however, the state later attacked defendant's credibility in its closing argument by questioning whether defendant's account of how he met the victim was true. Even so, the state's argument was not so grossly improper as to warrant a new trial. *See Golphin*, 352 N.C. at 452, 533 S.E.2d at 226. Accordingly, this argument is without merit.

**[9]** Defendant next argues the trial court erred by allowing the state to cross-examine defendant concerning three instances of his postarrest silence. According to defendant, this violated the Due Process

Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution.

Defendant first cites a line of questions asked by the state while cross-examining defendant:

Q ... [Y]ou knew that Tank could back you up on your story; didn't you?

A No, I didn't. I didn't know that Tank could back me up on my story.

Q Well, he could have told the police that he sent T-Bone there to meet you that night?

[DEFENSE COUNSEL]:

     Objection.

BY THE COURT:

     Sustained.

Defendant also cites a second set of questions the state asked him on cross-examination:

Q Now, right before lunch when we broke, I was talking to you about your arrest over in Durham on August the—late night of August the 12th, early morning hours of August the 13th. Do you remember when you were arrested?

A Yes.

Q And you were brought over to the police station here in Raleigh; is that correct?

A That's correct.

Q And when you got out of the car, a newsman asked you about commenting. Do you remember that? With news cameras and everything?

A Yes, I remember that. I remember that.

Q And you made some comments; didn't you?

A Uh-huh. (Affirmative) Yes, ma'am.

Q When you made some comments to the press that night, did you say anything about T-Bone?

**STATE v. FAIR**

[354 N.C. 131 (2001)]

A  No, I didn't say anything about T-Bone.

Q  Did you say anything about Tony?

A  No.

Q  Did you, when you were interviewed by the press that night, or when you made the comments to the press that night, do you recall making the statement, "I didn't kill nobody. I hope they find the real killer?"

A  Something to that—yes.

Q  And you hoped they found the real killer?

A  I might have said something to that effect.

Q  And if the videotape shows that you said that—

A  I remember saying that I didn't kill anybody. I remember that. I might have said I hoped they found who did it.

Q  Okay. Why didn't you say, "I know who the real killer is"?

[DEFENSE COUNSEL]:

Objection.

BY THE COURT:

Overruled.

[A]  I don't know.

. . . .

Q  Why didn't you offer some of that information?

A  I don't know. My thinking at that time, I couldn't tell you why I even spoke to the news people.

Q  Well, you knew at the time that you testified that somebody named T-bone killed Reuben McNeill, didn't you?

A  Yeah.

Q  And you didn't make that offer at that time?

A  No, I didn't.

Defendant also attributes error to the state's cross-examination of him concerning statements he made to a police officer while in a holding cell. Specifically, defendant argues the state improperly

asked him if he said the authorities could not "pin this on" him, that he was not "trying to run from them," and that "they were just slow to catch" him. According to defendant, these questions attacked defendant's alibi by implying that if he was actually innocent and his story was true, defendant would have revealed the identity of the true killer after defendant was arrested. Defendant claims these three instances of cross-examination violated his right to remain silent.

It is well established under both the United States and the North Carolina Constitutions that post-*Miranda* silence may generally not be used to impeach the defendant on cross-examination. *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98 (1976) (holding that when *Miranda* warnings are given, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial"); *State v. Rouse*, 339 N.C. 59, 95, 451 S.E.2d 543, 563 (1994) ("A defendant's silence after receiving *Miranda* warnings cannot be used against him as evidence of guilt."), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). This rule is supported by the assurance, given explicitly in the *Miranda* warnings, that silence will carry no penalty. *Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98; *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

When the defendant chooses to speak *voluntarily* after receiving *Miranda* warnings, however, the rule in *Doyle* is not triggered. *Anderson v. Charles*, 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226 (1980) (per curiam); *State v. Westbrooks*, 345 N.C. 43, 65, 478 S.E.2d 483, 496-97 (1996). "Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson*, 447 U.S. at 408, 65 L. Ed. 2d at 226. Once the defendant speaks voluntarily, cross-examination on those statements is permissible if it "merely inquires into prior inconsistent statements." *Id.* Cross-examination can properly be made into why, if the defendant's trial testimony regarding his alibi is true, he did not include in his earlier statement the relevant information disclosed at trial. *Id.* at 408-09, 65 L. Ed. 2d at 227. Conversely, cross-examination on prior inconsistent statements is improper if it is intended to elicit meaning from, or comment on, the defendant's exercise of his or her right to remain silent. *Id.*

This Court has adopted the rule of *Doyle* and *Anderson* but has added a further analysis. *Westbrooks*, 345 N.C. at 66, 478 S.E.2d at 497;

*see also Jenkins v. Anderson*, 447 U.S. 231, 239, 65 L. Ed. 2d 86, 95 (1980) (holding that "[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative"). Our next step in that analysis is to determine whether the admission of the challenged testimony is consistent with the rules of evidence regarding prior inconsistent statements. *Westbrooks*, 345 N.C. at 64, 478 S.E.2d at 496.

Under the North Carolina Rules of Evidence, a prior statement is considered inconsistent if it fails to mention a material circumstance presently testified to which would have been natural to mention in the prior statement. *State v. Lane*, 301 N.C. 382, 386, 271 S.E.2d 273, 276 (1980). In *Lane*, the defendant denied that he sold drugs to an undercover agent, but later testified to a different alibi. *Id.* This Court held that cross-examination on the earlier denial was improper because it would not have been natural under the circumstances for the defendant to have mentioned his alibi defense at that time. *Id.* Under the North Carolina Rules of Evidence, even the failure to speak may be considered an inconsistent statement and proper for impeachment. *State v. Mack*, 282 N.C. 334, 193 S.E.2d 71 (1972).

As a preliminary matter, we note that in the first set of questions cited above, the trial court sustained defendant's objection to the following: "Well, he could have told the police that he sent T-Bone to meet you there that night?" When the objection is immediately sustained, the use of defendant's silence for impeachment purposes is avoided and no due process violation occurs. *Greer v. Miller*, 483 U.S. 756, 764, 97 L. Ed. 2d 618, 629-30 (1987). As to the state's cross-examination concerning statements defendant made to police while in a holding cell, we have reviewed the portion of the transcript cited by defendant and conclude that the state asked no questions concerning defendant's silence. After thorough review, we discern no error in this portion of the state's cross-examination.

The sole remaining issue in this assignment of error is whether the trial court properly overruled defendant's objection to the question, "Why didn't you say, 'I know who the real killer is'?" Turning to this issue, we first note it is unclear from the record whether defendant was advised of his right to remain silent at the time of his arrest. Defendant makes no assertion in his brief that such a warning had in fact been given. Assuming *arguendo* that defendant was advised of

his right to remain silent, we hold that defendant's constitutional rights were not violated by the cross-examination at issue.[1] Defendant chose not to exercise his right to remain silent, but instead spoke voluntarily to the press, in the presence of the police, after he was arrested. *See Anderson*, 447 U.S. at 408, 65 L. Ed. 2d at 226; *Rouse*, 339 N.C. at 95, 451 S.E.2d at 563. Cross-examination focused on defendant's statements, and the implications thereof, and not on defendant's silence.

The cross-examination that took place in this case is similar to that in *Anderson*, where the defendant was asked why, if his testimony was true, he did not tell the same story to the police upon his arrest. 447 U.S. at 405-06, 65 L. Ed. 2d at 224-25. In *Anderson*, as here, the state did not draw meaning from the defendant's prior silence, but instead used, for purposes of impeachment, the statements of a defendant who had voluntarily chosen not to remain silent. *Id.* at 408-09, 65 L. Ed. 2d at 227.

Accordingly, in the instant case, when the state asked defendant *why he did not inform someone that he knew who the real killer was,* it did not capitalize on any previous assurance made to defendant that he had the right to remain silent. *See Doyle*, 426 U.S. at 618-19, 49 L. Ed. 2d at 98. Rather, the state permissibly challenged defendant's voluntary and inconsistent prior statement. *See Anderson*, 447 U.S. at 408, 65 L. Ed. 2d at 226. The impeachment therefore did not violate defendant's constitutional rights.

After his arrest, defendant told the press that he did not kill anyone and that he hoped they would find the real killer. Implicit in this statement was the assertion that defendant did not know the identity of the real killer. Defendant's trial testimony, in which he revealed the alleged identity of the real killer, was clearly inconsistent with this earlier statement to the press. The inquiry under the test set out in *Lane* becomes: Accepting the defendant's present alibi—that he was not the killer—as true, would it have been natural for him to have revealed the identity of the killer at the time he commented to the press? 301 N.C. at 386, 271 S.E.2d at 276. We believe that it would have been natural for defendant to have included this information

---

1. If no *Miranda* warnings were given prior to defendant's comments to the media, no constitutional violation nonetheless occurred during the cross-examination at issue. *See Fletcher v. Weir*, 455 U.S. 603, 607, 71 L. Ed. 2d 490, 494 (1982) (holding that where postarrest *Miranda* warnings were not given, cross-examination as to postarrest silence does not violate due process when defendant chooses to take the stand).

in his voluntary statement to the press if defendant did indeed have information about the identity of the killer. *See id.* Under the rules of evidence, defendant's prior inconsistent statement was properly used to impeach his trial testimony. *See Jenkins*, 447 U.S. at 240, 65 L. Ed. 2d at 96; *Westbrooks*, 345 N.C. at 65, 478 S.E.2d at 496. Accordingly, this argument is rejected.

**[10]** Defendant next assigns error to the trial court's refusal to instruct the jury to disregard the state's closing argument that the jury could use defendant's postarrest silence as a basis for disbelieving defendant's trial testimony. The state's closing argument referenced defendant's failure to mention his alibi on two occasions: when he voluntarily spoke to the media, and when he was arrested. Defendant first cites the following portion of the state's closing argument:

> [Defendant] never told his story to the police when the trail was hot, so to speak. That he never told the media who the alleged real killer was, but he did say to the media, I hope you catch the real killer. Consider that. An innocent man arrested for murder. An innocent man having in his pocket the names, telephone or pager number of the person who set this all up. The name and the telephone number of the man he said—or he says now, is the person who caused T-bone to make the delivery. An innocent man wouldn't say to the police, wouldn't say to the media, ["]I didn't do it, but let me tell you who did." No, the Defendant did not tell his story back then. The Defendant did not tell us that Tank had anything to do with this case. You heard Sergeant Lynch testify. The name Tank meant nothing to him until it was mentioned by the defense lawyers in opening statement. And it's then that we began to try to see where the pager number goes to, if anything. Some national account that they would never probably ever be able to trace. Why didn't the Defendant, if his story were true, why didn't he tell us way back then so that we could have done something—

[DEFENSE COUNSEL]:

    Objection.

BY THE COURT:

    Sustained.

[DEFENSE COUNSEL]:

> We would ask the jury be instructed to disregard that last paragraph.

BY THE COURT:

> Denied.

Defendant argues the trial court's refusal to instruct the jury to disregard this argument violated defendant's constitutional rights because the argument exacerbated the prejudice from the state's improper impeachment during cross-examination.

As previously noted, the state's use of defendant's prior inconsistent statement to the media for impeachment purposes during cross-examination was proper. In that portion of the state's closing argument outlined above, the state was again properly using defendant's voluntary, inconsistent statement to the media for impeachment purposes. *See State v. Buckner*, 342 N.C. 198, 221, 464 S.E.2d 414, 427 (1995), *cert. denied*, 519 U.S. 828, 136 L. Ed. 2d 47 (1996). The state's purpose is made clear in the conclusion to the challenged portion of argument, where the state asked, "Why didn't the Defendant, if his story were true, . . . tell us way back then so that we could have done something[?]" The state was properly attempting to impeach defendant's trial testimony by pointing out that if defendant was indeed innocent and his trial testimony were true, it would have been natural for defendant to have included the killer's identity in his comments to the media. *See Westbrooks*, 345 N.C. at 66-67, 478 S.E.2d at 497-98; *Lane*, 301 N.C. at 386, 271 S.E.2d at 276.

The second comment of which defendant complains involves defendant's conduct at the time he was arrested. Defendant alleges that the following portion of the state's closing argument violated defendant's constitutional rights:

> [Defendant] had Tank's pager number, supposedly, in his pocket when he was arrested. When that was retrieved from his pocket he didn't mention it then. What does your reason and common sense tell you about that?

According to defendant, because this argument sought to impeach him through his postarrest silence, the trial court should have intervened *ex mero motu*.

If the defendant chooses to testify, he is subject to impeachment when his earlier silence is inconsistent with his testimony on the

STATE v. FAIR

[354 N.C. 131 (2001)]

stand. *Portuondo v. Agard*, 529 U.S. 61, 69, 146 L. Ed. 2d 47, 56 (2000) (holding no constitutional violation where the prosecutor's comments concerned the defendant's credibility as a witness, rather than suggesting that his silence was evidence of guilt); *Raffel v. United States*, 271 U.S. 494, 497, 70 L. Ed. 1054, 1058 (1926) (holding that where the defendant "takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue"). Once the defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other witness." *Brown v. United States*, 356 U.S. 148, 154, 2 L. Ed. 2d 589, 596 (1958). Under our rules of evidence, even an omission constitutes an inconsistent statement subject to impeachment. *Mack*, 282 N.C. at 340, 193 S.E.2d at 75.

In the instant case, defendant elected to take the stand in his own defense. He therefore opened the issue of his credibility for scrutiny on cross-examination. The state referenced defendant's prior silence in its closing argument, not to draw meaning from it, but rather to impeach defendant's alibi. A card bearing the name "Tank" fell out of defendant's pocket during his arrest. The state properly pointed out that if Tank had sabotaged defendant as defendant claimed, then it would have been natural for defendant to have related that fact at the time of his arrest.

For these reasons, as well as the reasons stated in our discussion of defendant's prior assignment of error, defendant has shown no violation of his constitutional rights. The trial court thus did not err by failing to intervene *ex mero motu*. This argument is without merit.

[11] Defendant next argues that the trial court violated his constitutional right to confront the witnesses against him by allowing expert testimony to be predicated on hearsay. During trial, SBI Special Agent Brenda Bissette testified concerning the presence and the physical location of defendant's DNA on the victim's flipped-over pants pocket. Bissette's expert testimony was based in part on the testing of cloth samples cut from the victim's pants by SBI Special Agent Jenny Elwell. Agent Elwell was unavailable to testify at trial because she had delivered twins less than forty-eight hours before her scheduled testimony. Agent Bissette testified in her stead, noting that she had looked at the victim's pants herself to determine whether the cuttings were indeed taken from the areas indicated by Agent Elwell in her notes.

STATE v. FAIR

[354 N.C. 131 (2001)]

Defendant claims that the exact location of the cutting and the bloodstains was a crucial fact in his case, one upon which he was not allowed to cross-examine Agent Elwell. If the bloodstain was indeed from the victim's flipped-over pants pocket, the state's case would be considerably advanced. According to defendant, the location of the bloodstain was *substantive* evidence and thus was improperly proffered as the basis of an expert witness opinion. Allowing the location of the bloodstain to be proven via inadmissible hearsay, defendant argues, violated his constitutional right to confront the witnesses against him.

An expert may properly base his or her opinion on tests performed by another person, if the tests are of the type reasonably relied upon by experts in the field. N.C.G.S. § 8C-1, Rule 703 (1999); *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996); *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). The expert may also base his or her opinion on facts that would otherwise be inadmissible. *Huffstetler*, 312 N.C. at 106, 322 S.E.2d at 119. It is the expert opinion itself, not its underlying factual basis, that constitutes substantive evidence. *State v. Wade*, 296 N.C. 454, 251 S.E.2d 407 (1979).

In *Huffstetler*, this Court considered Agent Bissette's expert testimony concerning the identification of blood samples. 312 N.C. at 105, 322 S.E.2d at 119. Bissette testified on cross-examination that although she had not personally performed the blood tests, she could "interpret and visually scan" the test results and determine if the tests were properly conducted. *Id.* at 106, 322 S.E.2d at 119. There, as here, the defendant argued that his right to confrontation was violated because he was denied an opportunity to cross-examine the person who actually conducted the tests. *Id.* Relying on Rule 703 of the North Carolina Rules of Evidence, we rejected defendant's contention and determined:

[i]n such cases the defendant will have the right to fully cross-examine the expert witness who testifies against him. He will be free to vigorously cross-examine the expert witness, as did the defendant in the present case, concerning the procedures followed in gathering information and the reliability of information upon which the expert relies in forming his opinion. The jury will have plenary opportunity, as did the jury in this case, to understand the basis for the expert's opinion and to determine whether that opinion should be found credible.

*Huffstetler,* 312 N.C. at 108, 322 S.E.2d at 121; *see also Daughtry,* 340 N.C. at 511, 459 S.E.2d at 758-59 (holding that trial court properly allowed expert to testify concerning DNA in blood samples on the defendant's pants because, although expert did not conduct tests himself, expert reviewed the inherently reliable test report and was subject to vigorous cross-examination about the testing procedures).

In the present case, Agent Bissette had Agent Elwell's completed official report, including drawings, on which to rely. As in *Huffstetler,* although Agent Bissette had not personally cut the samples from the victim's clothes, she could "interpret and visually scan" the SBI report and determine the original location of the samples. 312 N.C. at 106, 322 S.E.2d at 119. Indeed, Bissette testified she not only had reviewed Elwell's report, but also had personally examined the cuttings along with the victim's pants and verified that the cuttings came from the locations designated in the report. Defendant was able to cross-examine Agent Bissette fully concerning the original location of the blood samples. *Id.* at 108, 322 S.E.2d at 121.

Furthermore, the relevant blood samples, the cuttings, and the victim's pants were admitted into evidence at trial and were included in the record on appeal. Our examination of these exhibits reveals it was unnecessary for defendant to cross-examine either Bissette or Elwell concerning the location of the blood samples. Defendant was able to use physical evidence—the samples, the cuttings, and the victim's pants—to argue to the jury that the samples could not have originated from the location urged by the state. Defendant was also free to conduct his own scientific tests on the samples, cuttings, and pants and to present the results to the jury. Moreover, the jury was free to examine this evidence and make its own determination. Accordingly, defendant's argument that his right to confront witnesses was violated is without merit.

## CAPITAL SENTENCING PROCEEDING

**[12]** Defendant next argues the trial court erred in submitting two statutory mitigating circumstances as nonstatutory mitigating circumstances. At trial, defendant requested, and the trial court submitted, nineteen nonstatutory mitigating circumstances and the (f)(9) catchall circumstance. Defendant argues, however, that two of the nonstatutory mitigating circumstances submitted mirror the statutory mitigating circumstances in N.C.G.S. § 15A-2000(f)(2) and (f)(6). Despite defendant's request at trial that these mitigating circum-

stances be submitted in nonstatutory form, defendant now argues the trial court was under an "independent duty" to submit the statutory mitigators because they were supported by sufficient evidence. Defendant argues that the trial court's error was prejudicial, in essence, because he was denied the opportunity to have the jury automatically give these circumstances mitigating value.

The trial court is required to submit a statutory mitigating circumstance to the jury if it is supported by substantial evidence. N.C.G.S. § 15A-2000(b) (1999); *State v. Hooks*, 353 N.C. 629, 639, 548 S.E.2d 501, 509 (2001); *State v. Chandler*, 342 N.C. 742, 756, 467 S.E.2d 636, 644, *cert. denied*, 519 U.S. 875, 136 L. Ed. 2d 133 (1996). This is the case even where the defendant objects to submission of the mitigator. *State v. Lloyd*, 321 N.C. 301, 311-12, 364 S.E.2d 316, 323-24 (1988), *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988). The defendant carries the burden of producing substantial evidence on a specific mitigating circumstance. *Hooks*, 353 N.C. at 639, 548 S.E.2d at 509. If a jury finds that a statutory mitigating circumstance exists, it must consider that circumstance in its final sentence determination. *State v. Mahaley*, 332 N.C. 583, 598, 423 S.E.2d 58, 67 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995). We consider each mitigating circumstance in turn.

**[13]** First, we consider whether the trial court should have submitted the (f)(2) statutory mitigating circumstance, which provides that "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance." N.C.G.S. § 15A-2000(f)(2). "While under the influence" has been interpreted to mean that the defendant was mentally or emotionally disturbed at the time the crime took place. *Chandler*, 342 N.C. at 757, 467 S.E.2d at 644. In the present case, defendant argues that the evidence warranted submission of the (f)(2) factor because he not only was under the influence of drugs at the time of the murder, but also was depressed because of his involvement in a family crisis prior to the murder.

As a preliminary matter, we note, and defendant concedes, that voluntary intoxication, standing alone, does not warrant submission of the (f)(2) mitigator. *Id.* at 757, 467 S.E.2d at 644-45. Accordingly, evidence of defendant's drug abuse is insufficient to warrant reversal on this issue. As to defendant's depression and family crisis, the record reveals that defendant received counseling concerning his substance abuse, basic need for shelter, and academic and family problems. Even defendant's own witnesses, however, did not testify

STATE v. FAIR

[354 N.C. 131 (2001)]

that defendant had been medically diagnosed as suffering from depression. No evidence was presented from any of these witnesses that defendant had been diagnosed as "under the influence of mental or emotional disturbance" at all, let alone at the time of the killing.

This lack of evidence is the critical factor in resolving the instant issue. The (f)(2) mitigating circumstance is properly submitted only if there is evidence to show that a mental or emotional disturbance existed and that it impacted defendant *at the time of the murder*. *See id.* (trial court properly failed to submit (f)(2) mitigating circumstance where expert testified defendant suffered from substance abuse and mixed personality disorder, but expert admitted on cross-examination he did not know what effect alcohol mixed with a personality disorder would have had on defendant's actions). Accordingly, the mere fact that defendant was depressed or suffering a family crisis prior to the murder does not warrant submission of the (f)(2) mitigator when, as here, there was not substantial evidence that defendant was depressed or in crisis at the time he killed the victim. *See id.* at 757, 467 S.E.2d at 644.

**[14]** We next address defendant's argument concerning the (f)(6) mitigating circumstance. This mitigating circumstance provides that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6). According to defendant, the evidence of his extensive and continuous drug use required the trial court to submit the (f)(6) mitigating circumstance.

This Court has held that evidence of drug use can support submission of the (f)(6) mitigating circumstance. *State v. McLaughlin*, 330 N.C. 66, 68-70, 408 S.E.2d 732, 733-34 (1991) (evidence that on the day of the murder defendant ingested marijuana, wine, beer, and "two hits of acid" supported submission of mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law .was impaired); *State v. Irwin*, 304 N.C. 93, 106, 282 S.E.2d 439, 448 (1981) ("[v]oluntary intoxication, to a degree that it affects defendant's ability to understand and to control his actions is properly considered under . . . G.S. 15A-2000(f)(6)") (citation omitted). Submission of the (f)(6) mitigator is required only if the evidence shows that voluntary intoxication impaired defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law *at the time of the murder*. *State v. Miller*, 339 N.C. 663, 687, 455 S.E.2d 137, 150

(despite evidence of defendant's drug abuse and withdrawal, trial court properly refused to submit (f)(6) because there was "no evidence that [defendant] was impaired by drugs or withdrawal therefrom at the time of the murder, or that any symptoms of withdrawal he may have experienced at that time impaired his capacity."), *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995).

In the present case, defendant offered evidence of his cocaine habit but did not show a link between his drug use and his allegedly impaired capacity at the time of the murder. *See id.* At most, the record reveals that defendant's search for drugs on the night of 4 August 1998 may have been a motive for defendant to kill the victim. This evidence is insufficient to support submission of the (f)(6) mitigator. This assignment of error fails.

## INEFFECTIVE ASSISTANCE OF COUNSEL

[15] Defendant next alleges he was denied his right to the effective assistance of counsel. He argues that *any* claim of ineffective assistance of counsel (IAC) should properly be litigated in a motion for appropriate relief (MAR).

IAC claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing. *Compare Blakeney*, 352 N.C. at 308-09, 531 S.E.2d at 814-15 (concluding that IAC claim alleging counsel's ineffectiveness in failing to interpose an objection was appropriately resolved on direct appeal), *with State v. House*, 340 N.C. 187, 196-97, 456 S.E.2d 292, 297 (1995) (determining that whether defendant consented to argument of his counsel regarding defendant's guilt was appropriately deferred for consideration in MAR). This rule is consistent with the general principle that, on direct appeal, the reviewing court ordinarily limits its review to material included in "the record on appeal and the verbatim transcript of proceedings, if one is designated." N.C. R. App. P. 9(a).

We agree with the reasoning in *McCarver v. Lee*, 221 F.3d 583, 589 (4th Cir. 2000), *cert. denied*, 531 U.S. 1089, 148 L. Ed. 2d 694 (2001): "N.C.G.S. § 15A-1419 is not a general rule that any claim not brought on direct appeal is forfeited on state collateral review. Instead, the rule requires North Carolina courts to determine whether the particular claim at issue could have been brought on direct review."

Accordingly, should the reviewing court determine that IAC claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent MAR proceeding. *See State v. Kinch*, 314 N.C. 99, 106, 331 S.E.2d 665, 669 (1985) ("We cannot properly determine this issue on this direct appeal because an evidentiary hearing on this question has not been held. Our decision on this appeal is without prejudice to defendant's right to file a [MAR] in the superior court based upon an allegation of [IAC]."). It is not the intention of this Court to deprive criminal defendants of their right to have IAC claims fully considered. Indeed, because of the nature of IAC claims, defendants likely will not be in a position to adequately develop many IAC claims on direct appeal. Nonetheless, to avoid procedural default under N.C.G.S. § 15A-1419(a)(3), defendants should necessarily raise those IAC claims on direct appeal that are apparent from the record. *See McCarver*, 221 F.3d at 589-90. When an IAC claim is raised on direct appeal, defendants are not required to file a separate MAR in the appellate court during the pendency of that appeal.

Defendant presents five instances of conduct by his attorney that he argues denied him his right to effective assistance of counsel. These instances may be determined from the record alone, and we therefore decide them on the merits. Appellate counsel is commended for properly raising these claims on direct appeal.

**[16]** Attorney conduct that falls below an objective standard of reasonableness and prejudices the defense denies the defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984); *State v. Strickland*, 346 N.C. 443, 454-55, 488 S.E.2d 194, 200-01 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). An IAC claim must establish both that the professional assistance defendant received was unreasonable and that the trial would have had a different outcome in the absence of such assistance. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693.

Defendant argues that his counsel elicited a damaging admission from him on direct examination regarding defendant's assault on a convenience store clerk. Our review of the record reveals that counsel elicited this admission as a matter of reasonable trial strategy. The admission corroborated defendant's defense that his addiction to crack cocaine drove him to commit seemingly inculpatory acts, such as taking the victim's car and using his credit cards.

Defendant next points to counsel's failure to object when defendant was cross-examined about his communications with his attorney. The prosecutor asked, "[W]hen did you first tell anybody at all about 'Tank'?" and defendant responded, "When I told my lawyers." Defendant argues that although these communications were protected by the attorney-client privilege, which protects confidential communications made by a client to his attorney, *State v. Brown*, 327 N.C. 1, 20, 394 S.E.2d 434, 446 (1990), counsel took no action to shield these communications from the jury. The communication at issue here is not protected by the privilege, however, because it was not confidential. Rather, the substance of the communication had already been exposed to the jury as an aspect of defendant's defense. Moreover, even if the communication had been confidential, defendant waived the attorney-client privilege when he presented the substance of the communication as part of his defense.

Defendant also argues that counsel failed to object when the state allegedly impeached him with his postarrest silence. As detailed in our previous analysis, the state's impeachment of defendant was proper. There was no basis for an objection by trial counsel, and thus there was no ineffective assistance of counsel.

Defendant next asserts that counsel denied him effective assistance by failing to object to the state's closing argument. The state's argument challenged the veracity of defendant's account of the night the victim was killed. For the reasons delineated above, this argument was not so grossly improper as to render the trial fundamentally unfair. Further, defendant has failed to show prejudice under the second prong of *Strickland. See Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693.

Finally, defendant asserts that his counsel was ineffective in requesting submission of the N.C.G.S. § 15A-2000(f)(2) and (f)(6) statutory mitigating circumstances as nonstatutory mitigating circumstances. Defendant argues that counsel deprived him of the opportunity to have the jury automatically give mitigating value to the (f)(2) and (f)(6) circumstances if the jury found them to exist. As previously discussed, the evidence did not support the submission of these statutory mitigating circumstances. This claim of ineffective assistance therefore fails.

Defendant has failed to show that his attorney's conduct rose to the level of unreasonableness or that his attorney's conduct preju-

diced defendant's trial. *See id.* Defendant's ineffective assistance of counsel claims are thus without merit.

## PRESERVATION

Defendant raises one additional issue to preserve it for later review: the trial court's refusal to dismiss the short-form murder indictment on constitutional grounds.

Defendant presents no argument requesting this Court to reconsider its prior holdings on this issue. *See, e.g., State v. Braxton,* 352 N.C. 158, 173, 531 S.E.2d 428, 436-37 (2000), *cert. denied,* —— U.S. ——, 148 L. Ed. 2d 797 (2001); *State v. Wallace,* 351 N.C. 481, 503-09, 528 S.E.2d 326, 340-43, *cert. denied,* 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). Accordingly, this assignment of error is without merit.

## PROPORTIONALITY REVIEW

[17] Having concluded defendant's trial and capital sentencing proceeding were free of error, we must next review and determine: (1) whether the record supports the jury's finding of any aggravating circumstances upon which the death sentence was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation, and under the felony murder rule. The jury answered "yes" to each of the three aggravating circumstances submitted: (1) defendant had previously been convicted of a felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) defendant committed the murder while engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); and (3) the murder was especially heinous, atrocious or cruel, N.C.G.S. § 15A-2000(e)(9).

Of the twenty mitigating circumstances submitted, one or more jurors found that: (1) this murder was committed while defendant was under the influence of mental or emotional disturbance caused by his abuse of crack cocaine; (2) the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired by his ingestion of crack cocaine on the day and the night of and just before the murder; (3)

defendant compiled a good academic record, including being on the dean's list, while at Fayetteville State University; (4) defendant was accepted as a transfer student and enrolled at North Carolina State University in 1996 and studied civil engineering; (5) defendant maintained a good record on parole until he began using and became addicted to crack cocaine; (6) defendant has acknowledged his addiction to crack cocaine; (7) defendant sought to obtain in-patient treatment for his drug addiction at the Wake Alcohol Treatment Center on 27 July 1998; (8) defendant interviewed at Cornerstone, a division of Wake Mental Health, on 3 August 1998, attempting to get help with his cocaine addiction; and (9) other circumstances arising from the evidence pursuant to N.C.G.S. § 15A-2000(f)(9).

After thoroughly examining the record, transcript, and briefs in this case, we conclude the evidence fully supports the aggravating circumstances found by the jury. N.C.G.S. § 15A-2000(d)(2). Further, there is no evidence that defendant's death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor. *Id.*

Finally, we turn to our statutory duty of proportionality review. In our proportionality review, we must determine " 'whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant.' " *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993) (quoting *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983)), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). Proportionality review is intended to " 'eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *State v. Atkins*, 349 N.C. 62, 114, 505 S.E.2d 97, 129 (1998) (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). We must compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate, as well as those in which the death penalty was held to be proportionate. *McCollum*, 334 N.C. at 240, 244, 433 S.E.2d at 162, 164. Whether a death sentence is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

This Court has found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v.*

*Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

After thorough comparison, we hold that the present case is not substantially similar to any case in which this Court found a death sentence disproportionate. Defendant in the present case was convicted of first-degree murder on the basis of malice, premeditation, and deliberation, and under the felony murder rule. "[A] finding of premeditation and deliberation indicates 'a more calculated and cold-blooded crime.' " *State v. Harris,* 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee,* 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied,* 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Moreover, the facts show that defendant repeatedly stabbed a man; stole his wallet, money, jewelry, and car; left the man to die; and went on a shopping spree with the man's credit cards.

In our review of this case, we have also compared it with cases where this Court found the death penalty to be proportionate. *See McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. Although we consider all the cases in the pool of similar cases during proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.*

North Carolina courts recognize four statutory aggravating circumstances, each of which, standing alone, is sufficient to sustain a death sentence. *See State v. Bacon,* 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995); *see also* N.C.G.S. § 15A-2000(e). In the instant case, the jury found three of the four aggravating circumstances: (e)(3), (e)(5), and (e)(9). Thus, we conclude that the present case bears more similarity to cases in which we have found a death sentence to be proportionate than it does to those cases in which we have found a death sentence to be disproportionate. *See McCollum,* 334 N.C. at 244, 433 S.E.2d at 164.

In the exercise of our experienced judgment, the members of this Court hold that, based on the characteristics of this defendant and

the crimes he committed, the death sentence is not disproportionate in this case. *See Green*, 336 N.C. at 198, 443 S.E.2d at 47. This assignment of error is without merit.

Accordingly, defendant received a fair trial, free of prejudicial error.

NO ERROR.