STATE OF NORTH CAROLINA v. TIMOTHY SETH PHILLIPS

No. COA04-933

(Filed 19 July 2005)

## 1. Evidence— cross-examination—credibility—impeachment

The trial court did not abuse its discretion in a first-degree murder by torture, first-degree felony murder, and felonious child abuse inflicting serious bodily injury case by permitting the State to ask defendant during cross-examination if he had a conversation with the owner of a water company that serviced defendant's residence and whether he told the owner "that water done killed my baby," because: (1) testing defendant's credibility and impeaching his explanations of the minor child's cause of death is relevant evidence well within the scope of cross-examination; and (2) while this line of questioning may be damaging to defendant and cast doubt on his theory and explanation of the cause of the child's death, such evidence is highly probative of the issues at trial.

## 2. Criminal Law— failure to grant mistrial ex mero motu— curative instruction

The trial court did not err in a first-degree murder by torture, first-degree felony murder, and felonious child abuse inflicting serious bodily injury case by failing to grant a mistrial ex mero

motu after the State withdrew the testimony of the owner of a water company that serviced defendant's residence that stated defendant said "that water had killed his child" because assuming the testimony before the jury was improper, the court cured any error by its action in sustaining the objection and giving a curative instruction.

**3. Criminal Law— failure to reopen evidence—newly discovered evidence—cumulative**

The trial court did not abuse its discretion in a first-degree murder by torture, first-degree felony murder, and felonious child abuse inflicting serious bodily injury case by failing to reopen the evidence to allow admission of newly discovered evidence from a newly found witness who stated he saw the victim crash on his bicycle, which evidence defendant contends shows how the victim got bruises on his body, because: (1) defendant had the opportunity to learn of the witness's presence at his younger son's bicycle accident through his older son prior to and during trial; (2) even though the witness's testimony may have corroborated defendant's testimony regarding the severity of his younger son's bicycle wreck, defendant testified on direct and cross-examined his older son extensively regarding the younger son's bicycle wreck; (3) the witness's testimony was cumulative regarding the possible causes of the younger son's bruises and would have only possibly served to corroborate defendant's testimony or facts brought to the jury's attention during the older son's cross-examination; and (4) two doctors attributed the younger son's cause of death to hypothermia and not to bruises. N.C.G.S. § 15A-1226(b).

**4. Constitutional Law— effective assistance of counsel—failure to move for mistrial—insufficient record**

Although defendant contends he received ineffective assistance of counsel (IAC) in a first-degree murder by torture, first-degree felony murder, and felonious child abuse inflicting serious bodily injury case by his counsel's failure to move for a mistrial after the State offered and later withdrew the direct testimony of the owner of a water company that serviced defendant's residence that defendant said "that water had killed his child," this assignment of error is dismissed without prejudice to defendant to move for appropriate relief and to request a hearing to determine whether he received effective assistance of counsel because: (1) the transcripts and records are insufficient to deter-

mine whether defense counsel's actions or inaction resulted from trial tactics and strategy, from a lack of preparation, or an unfamiliarity with the legal issues; and (2) defendant acknowledges in his brief that he is unable, on the present record, to litigate any of those claims for IAC.

**5. Appeal and Error— preservation of issues—failure to assign error—failure to argue**

Defendant failed to assign error to or provide any argument in his brief regarding the trial court's ex parte communication with the Institute of Government as required by N.C. R. App. P. 28(b)(6), and thus, this issue is waived.

Judge WYNN concurring in the result.

Appeal by defendant from judgment entered 3 October 2003 by Judge Christopher M. Collier in Iredell County Superior Court. Heard in the Court of Appeals 22 March 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General Jill Ledford Cheek, for the State.*

*Public Defender Isabel Scott Day, by Assistant Public Defender Julie Ramseur Lewis, for defendant-appellant.*

TYSON, Judge.

Timothy Seth Phillips ("defendant") appeals from judgment entered after a jury found him to be guilty of first-degree murder by torture, first-degree felony murder, and felonious child abuse inflicting serious bodily injury. We find no error.

## I. Background

Defendant is the biological father of three-year-old Bailey Mallan ("Bailey"). Bailey lived in foster care beginning in January 2001 until he was placed in defendant's care on 20 December 2001. Defendant was accorded weekend visitation with his other children from a previous marriage, a twelve-year-old son, Seth Phillips ("Seth"), and a daughter.

### A. State's Evidence

### 1. Emergency Medical Personnel

On 14 January 2002, emergency medical personnel ("EMT") were dispatched to defendant's residence in response to a 911 call from

STATE v. PHILLIPS

[171 N.C. App. 622 (2005)]

defendant. Upon arrival, the EMTs found Bailey lying on the bedroom floor without a pulse. Defendant told the EMTs that: (1) Bailey had not felt well and had laid down; (2) defendant went to the mailbox and was gone for about fifteen minutes; (3) upon returning, he found Bailey in the bed not breathing; and (4) he called 911. EMT Phyllis Baity spoke with defendant and was told Bailey had suffered an asthma attack and stopped breathing. When Bailey arrived at the hospital, he had no pulse, no audible heart activity, and a core bodily temperature of sixty-nine degrees Fahrenheit. After three hours of resuscitative attempts and treatment for hypothermia, Bailey was pronounced dead.

On 25 March 2002, defendant was indicted for first-degree murder. The trial commenced on 22 September 2003.

### 2. Seth Phillips

At trial, Seth testified that after Bailey wet his bed defendant would become very angry and give Bailey a cold bath. Defendant would direct Seth to run a cold bath and to "turn it all the way cold." Defendant placed Bailey in the tub containing cold water up to his upper stomach. When Bailey tried to crawl out of the tub, defendant pushed him back into the water and told Bailey this was his punishment for wetting his bed.

Seth also testified: (1) defendant would occasionally quit watching television to make sure Bailey remained in the water for thirty to forty minutes; (2) Bailey would be crying and shivering when defendant removed him from the water; (3) defendant would lay Bailey across the washing machine with his legs hanging off the edge and spank him with a belt; (4) defendant would usually hit Bailey hard about three times; (5) defendant would place Bailey in a corner for about forty-five minutes to an hour; and (6) that this routine happened several times.

Seth further testified defendant had given Bailey a bicycle for Christmas. Seth stated Bailey experienced some accidents while riding the bicycle but none were severe. On the morning of 13 January 2003, the day before his death, Bailey again wet his bed. Seth stated that defendant administered the punishments described above.

### 3. Dr. Todd Hansen

The State tendered Dr. Todd Hansen ("Dr. Hansen") as an expert witness without objection from defendant. Dr. Hansen was an emer-

gency room physician who examined Bailey upon arrival at the hospital. He determined Bailey's core bodily temperature was sixty-nine degrees Fahrenheit.

Dr. Hansen opined that hypothermia was the major cause of Bailey's death. He could not offer any medical explanation how a child's temperature could drop to sixty-nine degrees within a fifteen minute time span after defendant asserted he had last checked on Bailey. Dr. Hansen also testified the center bar on Bailey's bicycle, as shown in a photograph, could not have caused the injuries on his buttocks Dr. Hanson observed and opined those injuries were not accidentally caused.

### 4. Dr. Patrick Eugene Lantz

The State offered Pathologist Patrick Eugene Lantz ("Dr. Lantz") as an expert witness without objection from defendant. Dr. Lantz performed the autopsy on Bailey and testified he observed bruises consistent with childhood type injuries and eight bruises on the back of Bailey's head. Dr. Lantz stated the eight bruises were consistent with adult finger "thumping" on the back of Bailey's head.

Dr. Lantz also observed bruising on Bailey's buttocks and testified in his opinion the injuries Bailey's body presented were not caused by falling from a bicycle and were not accidental. Dr. Lantz opined the linear nature of the bruises on the buttocks were consistent with Bailey having been struck with a belt. He found no evidence of any natural disease that would have caused or contributed to Bailey's death.

Based upon Bailey's weight and size, Dr. Lantz opined Bailey could have become severely hypothermic after remaining forty-five minutes to an hour and one-half in water with a temperature of forty-five to fifty-five degrees. Dr. Lantz opined that Bailey's cause of death was severe hypothermia and that hypoglycemia would not cause the bodily temperature to drop to sixty-nine degrees.

Dr. Lantz also observed two burn marks on Bailey's left arm and opined the marks were consistent with being caused by a cigarette or cigarette-like object. Finally, Dr. Lantz opined that the burns to Bailey's arm, the bruising on his buttocks, and severe hypothermia were painful injuries.

## B. Defendant's Evidence

Defendant testified in his defense. During cross-examination, defendant was asked about a telephone conversation that allegedly occurred with Danny Corriher ("Corriher") regarding the water service to defendant's residence. Defendant stated he spoke with a female to cancel his water services and insisted he did not talk to Corriher and did not say, "that water done killed my baby." Defense counsel made a general objection to this line of cross-examination.

## C. State's Rebuttal

Corriher is the proprietor of the water system which serviced defendant's residence. He was called as a witness for the State on rebuttal to impeach defendant's testimony and his answers on cross-examination. Corriher was asked if he was familiar with 124 Cove View Road located in Mooresville, North Carolina. Corriher testified he had spoken with a male calling from that address to cancel the water service but the person calling never identified himself. Corriher testified the person calling had stated, "that water had killed his child." Upon further questioning by Corriher the caller replied, "he died in the bathtub." Corriher stated he assumed that the caller's baby had drowned.

Defendant objected to this line of questioning and the judge excused the jury. After *voir dire*, the State withdrew Corriher's testimony. The judge instructed the jury that the State had withdrawn Corriher's testimony and defendant's answers to the State's cross-examination had been stricken and to not consider any of Corriher's testimony during deliberations.

After defendant rested his case on surrebuttal, a charge conference was held and court recessed for the evening. Upon arriving at his office the next day at 7:45 a.m., defense counsel received a tape recorded telephone message left by a caller who identified himself as Allen Lorek ("Lorek"). Lorek informed defense counsel that he had witnessed Bailey having a "bad" bicycle wreck and falling in a ditch. Defendant moved to reopen the evidence to allow this witness to rebut Seth's testimony and the State's evidence on the cause of Bailey's bruising. The court denied defendant's motion.

The jury found defendant guilty of first-degree murder by torture, first-degree felony murder, and felonious child abuse inflicting serious bodily injury. Defendant was sentenced to life imprisonment without parole. Defendant appeals.

## II. Issues

Defendant argues the trial court erred by: (1) permitting the State to question him in an improper and highly prejudicial manner; (2) not granting a mistrial *ex mero motu* after the State withdrew Corriher's testimony; and (3) not reopening the evidence to allow admission of newly discovered evidence. Defendant also asserts he was denied effective assistance of counsel.

## III. Defendant's Cross-Examination

**[1]** Defendant argues the trial court erred by permitting the State to question him in an improper and highly prejudicial manner. We disagree.

Pursuant to Rule 611(b) of the North Carolina Rules of Evidence, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C. Gen. Stat. § 8C-1, Rule 611(b) (2003). The trial court, however, "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." N.C. Gen. Stat. § 8C-1, Rule 611(a) (2003). " 'Because the manner of the presentation of evidence is a matter resting primarily within the discretion of the trial judge, his control of the case will not be disturbed absent a manifest abuse of discretion.' " *State v. Demos*, 148 N.C. App. 343, 351, 559 S.E.2d 17, 22 (quoting *State v. Harris*, 315 N.C. 556, 562, 340 S.E.2d 383, 387 (1986)), *cert. denied*, 355 N.C. 495, 564 S.E.2d 47 (2002).

During cross-examination, defendant was asked if he had a conversation with Corriher and whether he told Corriher, "that water done killed my baby." The State introduced the evidence for the purpose of challenging the credibility of defendant and his explanation of the cause of Bailey's death. Testing defendant's credibility and impeaching his explanations of Bailey's cause of death is relevant evidence well within the scope of cross-examination. N.C. Gen. Stat. § 8C-1, Rule 611(b). While this line of questioning may be damaging to defendant and cast doubt on his theory and explanation of the cause of Bailey's death, such evidence is highly probative of the issues at trial. The trial court did not abuse its discretion in allowing the questions. This assignment of error is overruled.

STATE v. PHILLIPS

[171 N.C. App. 622 (2005)]

## IV. *Ex Mero Motu*

**[2]** Defendant argues the trial court committed plain error by not declaring a mistrial *ex mero motu* after the State withdrew Corriher's testimony.

During rebuttal, the State asked Corriher if anything unusual was said during his telephone conversation. Corriher replied the caller stated, "that water had killed his child." Defense counsel objected and the trial court sustained the objection. The court recessed for lunch and after returning into session, the State moved to withdraw Corriher's testimony. Defendant moved to strike this testimony and asked that a curative instruction be given to the jury.

After the State moved to withdraw Corriher's testimony, defendant's motion to strike was granted. Curative instructions were given to the jury. "Jurors are presumed to follow a trial judge's instructions." *State v. Taylor*, 340 N.C. 52, 64, 455 S.E.2d 859, 866 (1995) (citing *State v. Rouse*, 339 N.C. 59, 92, 451 S.E.2d 543, 561 (1994)).

After the judge gave instructions to disregard Corriher's testimony, defense counsel thanked the court and proceeded to present his case without moving for a mistrial. Presuming Corriher's testimony before the jury was improper, " 'the court cured any error by its action in sustaining the objection and giving the curative instruction.' " *State v. Fletcher*, 125 N.C. App. 505, 512, 481 S.E.2d 418, 423 (1997) (quoting *State v. Bowie*, 340 N.C. 199, 209, 456 S.E.2d 771, 776, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 435 (1995)). The trial court did not err by not granting a mistrial *ex mero motu*. This assignment of error is dismissed.

## V. Newly Discovered Evidence

**[3]** Defendant asserts the trial judge erred by not reopening the evidence to allow admission of newly discovered evidence.

N.C. Gen. Stat. § 15A-1226(b) (2003) provides, "[t]he judge in his discretion may permit any party to introduce additional evidence at any time prior to verdict." Our Supreme Court has stated, "[t]he trial court has discretionary power to permit the introduction of additional evidence after a party has rested." *State v. Jackson*, 306 N.C. 642, 653, 295 S.E.2d 383, 389 (1982) (citing *State v. Revelle*, 301 N.C. 153, 270 S.E.2d 476 (1980); *State v. Carson*, 296 N.C. 31, 249 S.E.2d 417 (1978); *State v. Coffey*, 255 N.C. 293, 121 S.E.2d 736 (1961)). "It is within the discretion of the trial judge to permit, in the

interest of justice, the examination of witnesses at any stage of trial." *State v. Johnson*, 23 N.C. App. 52, 57, 208 S.E.2d 206, 210 (citing *State v. King*, 84 N.C. 737 (1881)), *cert. denied*, 286 N.C. 339, 210 S.E.2d 59 (1974).

We review this ruling for an abuse of discretion and will uphold a trial court's ruling under N.C. Gen. Stat. § 15A-1226(b) unless it is shown to be "manifestly unsupported by reason." *State v. Farmer*, 138 N.C. App. 127, 130, 530 S.E.2d 584, 587 (2000) (citing *State v. Wooten*, 344 N.C. 316, 474 S.E.2d 360 (1996)); *see also State v. Carson*, 296 N.C. 31, 45, 249 S.E.2d 417, 425 (1978) (even after arguments to the jury have begun, it is not an abuse of discretion for the court to allow additional evidence).

After defendant rested his case on surrebuttal, a charge conference was held. The court was recessed for the evening. A caller, who identified himself as Lorek left a message on defense counsel's telephone recorder stating he had previously seen Bailey have a bad bicycle wreck and fall into a ditch. Defense counsel called the trial judge at 8:10 a.m. to inform him of the message and moved the court to reopen the evidence. The tape recording of Lorek's message was presented to and heard by the court.

On the tape, the caller identified himself as "Allen Lorek," and stated: (1) "I saw the little boy crash, he fell into my ditch;" (2) "I ran out into my yard [sic] ask him if he was ok and his brother was there also;" and (3) "I don't think that he hit his little boy, I think the little guy actually did crash on his bicycle [sic] cause I saw it."

Defendant argues the State would not have been prejudiced by reopening the evidence because neither side had concluded their case through closing arguments. The State objected to reopening the evidence. The trial court denied defendant's motion to reopen the evidence but allowed the tape to be admitted as a proffer of evidence.

Although defendant may not have previously been aware of Lorek's testimony and presented the evidence and moved the court to reopen the evidence as soon as it was available to him, those facts alone do not warrant a new trial. During preparation for trial, defendant with due diligence could have asked his son, Seth, whether anyone else was present when Bailey fell from his bicycle. Also, during Seth's cross-examination, defendant could have inquired whether any other person witnessed or made any comments regarding Bailey's fall from the bicycle.

Even though Lorek's testimony may have corroborated defendant's testimony regarding the severity of the bicycle wreck, defendant testified on direct and cross-examined Seth extensively regarding Bailey's bicycle wrecks. Relevant "evidence may be excluded . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. Lorek's testimony was cumulative and would have only possibly served to corroborate defendant's testimony or facts brought to the jury's attention during Seth's cross-examination. *Id.*

Both Dr. Hansen and Dr. Lantz attributed Bailey's cause of death to hypothermia and not to bruises. The trial court did not abuse its discretion finding Lorek's testimony to be cumulative regarding the possible causes of Bailey's bruises and not allowing defendant's motion to reopen the trial for additional evidence. This evidence is merely cumulative to other evidence and testimony defendant placed before the jury for its consideration. *Id.* Defendant has failed to show any abuse in the trial court's discretion. This assignment of error is overruled.

## VI. Ineffective Assistance of Counsel

[4] Defendant asserts his trial counsel failed to provide meaningful assistance which prejudiced his defense by not moving for a mistrial after the State offered Corriher's direct testimony and later withdrew it.

A defendant's ineffective assistance of counsel ("IAC") claim may be brought on direct review "when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (citations omitted), *motion to withdraw opinion denied*, 354 N.C. 576, 558 S.E.2d 861 (2001), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).

Here, the record is insufficient for us to review and rule on defendant's claim. The transcripts and record are insufficient for us to determine whether defense counsel's actions or inaction resulted from trial tactics and strategy or from a lack of preparation or an unfamiliarity with the legal issues. Further, defendant acknowledges in his brief that he "is unable, on the present record, to litigate any of those claims for [IAC]." We decline to reach defendant's IAC assignment of error because it is not properly raised at this stage of review. This assignment of error is dismissed.

Our dismissal of this assignment of error is without prejudice to defendant to move for appropriate relief and to request a hearing to determine whether he received effective assistance of counsel. *See State v. Dockery*, 78 N.C. App. 190, 192, 336 S.E.2d 719, 721 (1985) ("The accepted practice is to raise claims of ineffective assistance of counsel in post-conviction proceedings, rather than direct appeal." (citing *e.g., State v. Vickers*, 306 N.C. 90, 291 S.E.2d 599 (1982)).

## VII.  Trial Court's *Ex Parte* Communication

[5] Defendant failed to assign error to or provide any argument in his brief regarding the trial court's *ex parte* communication with the Institute of Government. N.C.R. App. P. 28(b)(6) (2004). Any discussion regarding the trial court's action and authority is extraneous to and not germane to any issue before us on appeal.

> Looseness of language and *dicta* in judicial opinions, either silently acquiesced in or perpetuated by inadvertent repetition, often insidiously exert their influence until they result in confusing the application of the law, or themselves become crystallized into a kind of authority which the courts, without reference to true principle, are constrained to follow.

*Smith v. R.R.*, 114 N.C. 728, 749-50, 19 S.E. 863, 869 (1894); *see also State v. Clark*, 165 N.C. App. 279, 293, 598 S.E.2d 213, 223 (J. Wynn concurring in the result only by separate opinion), *disc. rev. denied*, 358 N.C. 734, 601 S.E.2d 866, *appeal dismissed*, 359 N.C. 192, 607 S.E.2d 651 (2004).

## VIII.  Conclusion

Defendant failed to show the trial court committed prejudicial error in allowing the State to question defendant on cross-examination regarding a purported telephone conversation with Corriher. The trial court struck this testimony and provided curative instructions to the jury. The trial court did not err in not granting a mistrial *ex mero motu.*

Defendant failed to show the trial court abused its discretion by not allowing defendant to introduce testimony of a newly found witness. That witness's proffered testimony was cumulative of other evidence defendant already presented. Defendant had the opportunity to learn of Lorek's presence at Bailey's bicycle accident through his son, Seth, prior to and during trial.

Defendant's claim of ineffective assistance of counsel is not properly before us and is dismissed without prejudice. Defendant received a fair trial free from prejudicial errors he preserved and argued.

No error.

JUDGE ELMORE concurs.

JUDGE WYNN concurs in the result by separate opinion.

WYNN, Judge concurring in the result.

I write separately to note in passing[1] an apparently on-going occurrence in our judiciary in which judges are permitted, without restriction, under our Code of Judicial Conduct to engage in *ex parte* discussions on issues of law with individuals ("disinterested experts") who are not parties to the proceeding. N.C. Code of Judicial Conduct Canon 3(A)(4) (2003).[2]

In this case, the trial court initially indicated that it would admit evidence of a telephone conversation that Corriher allegedly had with Defendant. Shortly thereafter, however, the State withdrew Corriher's testimony. The trial court responded that it thought the testimony was admissible and had conferred with the Institute of Government during the lunch recess. After probing by defense counsel, the trial judge revealed the name of the individual that he spoke to at the Institute of Government, "Ms. Smith."

---

1. The practice of our courts commenting on relevant matters in the record that are not raised by the parties is well established by "noting in passing." *See, e.g., First Nat'l Bank of Lumberton v. McCaskill*, 174 N.C. 390, 391, 93 S.E. 905, 905 (1917) ("not[ing], in passing," the personal history of a party to a prior case); *Onuska v. Barnwell*, 140 N.C. App. 590, 591, 537 S.E.2d 840, 841 (2000) ("not[ing] in passing" an incorrect citation); *State v. Jenkins*, 21 N.C. App. 541, 543, 204 S.E.2d 919, 921 (1974) ("not[ing] in passing" that a breathalyzer test does not give rise to the inference that a party was "under the influence."). While not binding, this practice allows our courts to move beyond the technical rules of appeal to provide guidance for improving the legal profession.

2. Canon 3(A)(4) of the North Carolina Code of Judicial Conduct provides:

A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him.

While this assertion by the trial judge appears at first glance to be benign, I believe it raises a strong concern regarding the apparently common practice of judges consulting "disinterested experts" or obtaining opinions from non-judicial entities such as the Institute of Government[3] on the law applicable to a proceeding before them.

The primary reason that *ex parte* communications are prohibited, is to ensure that parties appearing "before a judge have access to the relevant materials on which a judge may rely." Andrew L. Kaufman, *Judicial Ethics: The Less-Often Asked Questions*, 64 WASH. L. REV. 851, 856 (1989). Nearly all states that allow a judge to engage in *ex parte* communication with an expert on the law require that certain due process and notice concerns be given to the parties. Indeed, those states generally track the language of the American Bar Association Model Code of Judicial Conduct Canon 3(B)(7) which gives guidance to the judiciary on the use of a disinterested expert.[4] The ABA Model Code of Judicial Conduct Canon 3(B)(7)(b) provides: "A judge may obtain the advice of a disinterested expert on the law

---

3. The mission of the Institute of Government located at the University of North Carolina at Chapel Hill is: "To provide to state, county, and municipal officials and employees programs of instruction, research, and consultation to help them improve and maintain their effectiveness, efficiency, and economy. The institute also provides special programs for the news media and non-profit organizations with governmentally related purposes." Institute of Government, *available at* http://www.ncruralcenter.org/guidebook/viewresource.asp?ID=27 (last visited 24 June 2005). The mission statement does not indicate the Institute of Government provides any services for criminal defendants.

4. The following states follow Model Code of Judicial Conduct Canon 3(B)(7): Ala. Canons of Judicial Ethics Canon 3(A)(4); Ark. Code of Judicial Conduct Canon 3; Cal. Code of Judicial Ethics Canon 3(B)(7); Colo. Code of Judicial Conduct Canon 3(A)(4); Conn. Code of Judicial Conduct Canon 3(A)(4); Del. Judges' Code of Judicial Conduct Canon 3(A)(4); Fla. Code of Judicial Conduct Canon 3(B)(7)(b); The Ga. Code of Judicial Conduct Canon 3(B)(7); Haw. Code of Judicial Conduct Canon 3(B)(7); Idaho Code of Judicial Conduct Canon 3(B)(7); Ind. Code of Judicial Conduct Canon 3(B)(8); La. Code of Judicial Conduct Canon 3(A)(4); Me. Code of Judicial Conduct Canon 3(B)(7); Md. Code of Judicial Conduct Canon 3(A)(5); Mich. Code of Judicial Conduct Canon 3(A)(4); Minn. Code of Judicial Conduct Canon 3(A)(4); Miss. Code of Judicial Conduct Canon 3(B)(4); Mo. Code of Judicial Conduct Canon 3(B)(7); Neb. Code of Judicial Conduct Canon 3(B)(7); Nev. Code of Judicial Conduct Canon 3(B)(7); N.J. Code of Judicial Conduct Canon 3(A)(6); N.M. Code of Judicial Conduct Rule 21-300(B)(7); 22 N.Y.C.R.R. § 100.3(B)(6); N.D. Code of Judicial Conduct Canon 3(B)(7); Ohio Code of Judicial Conduct Canon 3(B)(7); Okla. Code of Judicial Conduct Canon 3(B)(6); R.I. Code of Judicial Conduct Canon 3(B)(8); S.C. Code of Judicial Conduct Canon 3(B)(4); S.D. Code of Judicial Conduct Canon 3(B)(7); Tenn. Code of Judicial Conduct Canon 3(B)(7); Tex. Code of Judicial Conduct Canon 3(B)(8); Utah Code of Judicial Conduct Canon 3(B)(7); Vt. Code of Judicial Conduct Canon 3(B)(7); Va. Canons of Judicial Conduct Canon 3(B)(7); W. Va. Code of Judicial Conduct Canon 3(B)(7); Wis. SCR 60.04(1)(g); Wyo. Code of Judicial Conduct Canon 3(B)(7).

**STATE v. PHILLIPS**

[171 N.C. App. 622 (2005)]

applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." Thus, the Model Code requires that the trial judge give the parties notice of the expert consulted and the substance of the advice, as well as requires that the parties be given a chance to respond. *But see* Alaska Code of Judicial Conduct Canon 3(B)(7) (2005) (commentary to rule states "A judge may not ex parte seek advice on the law applicable to a proceeding from a disinterested expert.").

In contrast, our Code of Judicial Conduct does not give any guidance to the judiciary as to who is a "disinterested expert," whether the parties should be notified, whether the parties must be told the substance of the communication, whether the parties must be given a chance to respond to the expert's advice, or what exactly a judge may ask the expert. Instead, Canon 3(A)(4) unrestrictively provides that: "A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him."

Significantly, even in a criminal proceeding in which defendants are constitutionally entitled to be present at every critical stage of the criminal proceeding, U.S. Const. amend. VI; N.C. Const. art. I, § 23, our Code provides for no notice to parties of the *ex parte* communication with a "disinterested expert."[5] This creates a problem as the expert contacted by the trial judge is supposed to be disinterested in the parties, the issues and facts of the proceeding, and the outcome of the proceeding. Giving the parties notice of the *ex parte* communication, as well as the identity of the expert contacted and substance of the advice given, is prudent because

> it cannot be assumed that legal and other experts will give only objective advice. They may have developed philosophical loyalties which affect the advice that they give; as practicing attorneys they may have cases involving the same problems on which they are rendering advice; as consultants they may owe allegiance to business or other interests that could benefit from acceptance by courts of their viewpoints.

*In re Fuchsberg*, 426 N.Y.S.2d 639, 648 (N.Y. Ct. Jud. 1978).

---

5. In this case, the trial judge consulted the Institute of Government. Given that the mission of the Institute of Government is to serve only governmental entities (*see, supra*, footnote 3), it is questionable as to whether the Institute of Government qualifies as a "disinterested expert" on the law in a criminal proceeding.

Further, our Code does not require the court to allow parties a chance to respond to the substance of the advice given by the judge. "Unless the parties are given the opportunity to respond to the expert and the substance of his advice, his prejudices and preconceptions may go unchallenged. In short, the practice of judicial consultation with experts without notice to the parties is fraught with dangers." *Id.*; *see also* Leslie W. Abramson, *The Judicial Ethics of Ex Parte and Other Communications*, 37 HOUS. L. REV. 1343, 1374 (2000).

Clearly, Canon 3(B)(7) of the ABA Model Code gives a great deal more protection to the parties than does Canon 3(A)(4) of the N.C. Code of Judicial Conduct. But in the interest of protecting the independence, impartiality, and integrity of our judiciary, our judges should be cautious about having an *ex parte* communication with an "expert." At the very least, judges should give notice to the parties of the communication, the identity of the "disinterested expert," the substance of the communication, and afford the parties an opportunity to respond.[6] *See In re Fuchsberg*, 426 N.Y.S.2d at 648 (*"Ex parte* conversations or correspondence with experts, law teachers or otherwise, is unfair and can be misleading. The facts given may be incomplete or inaccurate, the problem can be incorrectly stated or other matters can be incorrectly stated.") (internal citation omitted).

It is essential that the independence, impartiality and integrity of the judiciary in the decision-making process are protected. After all, "[a]n independent and honorable judiciary is indispensable to justice in our society." N.C. Code of Judicial Conduct Canon 1.

---

6. It should be noted that in North Carolina, our trial judges are not provided research assistants. In federal courts, and increasingly in many state jurisdictions, trial judges are being provided the assistance of law clerks, which lessens the need to seek advice from "disinterested experts" on the law applicable to proceedings before them.