STATE OF NORTH CAROLINA
v.
MAURICE ALFONZO MOBLEY.
No. COA08-1415
Court of Appeals of North Carolina.
Filed June 16, 2009
This case not for publication
Attorney General Roy A. Cooper, III, by Assistant Attorney General Chris Z. Sinha, for the State.
Geoffrey W. Hosford for defendant-appellant.
JACKSON, Judge.
Defendant appeals from judgment and commitment orders for first-degree burglary, common law robbery, second-degree kidnapping and second-degree rape. For the following reasons, we hold no error.
The State's evidence tended to show that in May 2002, Wanda Hairston ("Hairston") lived alone in a condominium duplex, which had a front door and a back door off of the kitchen. On the night of 16 May 2002, Hairston went to a nightclub with friends. Hairston returned home at about 2:15 a.m. and entered through the front door. After eating spaghetti and watching television, she went to bed. Soon thereafter, Hairston heard a "clicking" sound, so she turned on the kitchen and living room lights. When Hairston turned on her outside light near the back door, she did not see anything outside. She turned off the lights and returned to bed, but then heard a loud banging noise. Hairston put on her housecoat, went to the front room, and turned on the lights again. After the third bang on the door, the back door broke open, and Hairston ran toward the front door.
While Hairston tried to open the front door, a black man came toward her wearing a hooded sweat shirt covering his face. The man put his hand over Hairston's mouth and told her to be quiet. The man led her to the master bedroom, placed a pillowcase over her head, and told her to kneel on the floor. The man put his penis into her vagina and began moaning. After he finished, the man led Hairston into the bathroom where he washed up. The man then asked Hairston if she had any money. She told him there was $600.00 in the desk to pay her bills. The man took the cash, the contents of Hairston's purse, and some of Hairston's jewelry. The man then opened up Hairston's housecoat and penetrated her vagina with his finger and fondled her breasts. After taking Hairston's cell phone and removing the batteries from her house phone, the man left through the back door. Hairston used a small "earphone" to call the police.
Upon receiving the call, Charlotte-Mecklenburg Police Officer Jeffrey Hoelscher ("Officer Hoelscher") transported Hairston from her condominium to the hospital, Detective Carol Owens ("Detective Owens") went to the hospital, and Detective Terry Brandon ("Detective Brandon") went to the crime scene. At Hairston's condominium, Detective Brandon observed Crime Scene Investigator Katrina Sarpy ("Investigator Sarpy") lift fingerprints from the back door. When Crime Scene Investigator Chris McTeague ("Investigator McTeague") arrived, Investigator Sarpy was "at the rear entry door . . . finishing processing it for latent prints." Detective Owens submitted the fingerprints lifted from the crime scene and had them compared with fingerprints from twenty-seven individuals, including defendant. Kathleen Ramseur ("Ramseur") initially analyzed the latent prints taken from the crime scene. For trial, Nancy Kearns ("Kearns"), a latent fingerprint examiner with the Charlotte-Mecklenburg Police Department ("the Police Department"), compared defendant's ten print cards with the latent fingerprints taken from Hairston's condominium. Kearns testified at trial that the latent prints matched defendant's ten prints, which was the same conclusion Ramseur had made.
Dr. David Sullivan examined Hairston at the hospital. During the rape kit examination, Hairston's blood, oral swabs, pubic hairs, head hairs, cheek scrapings, and vaginal and cervical swabs were obtained. Five days later, a crime scene investigator conducted a DNA bucal swab of defendant and obtained a head hair standard. John Donohue ("Donohue") performed a DNA analysis on Hairston's rape kit and defendant's bucal swab, and he prepared a report on his results. Aby Moeykens, ("Moeykens") who worked with the Police Department's crime laboratory in 2008, conducted a peer review of Donohue's report. At trial, Moeykens testified, over defendant's objection, that the DNA found on the vaginal swab of Hairston matched that of the bucal swab taken from defendant.
On appeal, defendant contends the trial court erred in allowing Moeykens to testify about Donohue's DNA laboratory report. During direct examination of Moeykens, the following exchange occurred:
Q. What were the findings when those items, the vaginal swabs, the known blood standard for Wanda Hairston, and the suspect bucal standards being used, what were the findings of Mr. Donohue?
[DEFENSE COUNSEL]: Objection.
THE COURT: What's the basis for your objection?
[DEFENSE COUNSEL]: Hearsay, Your Honor. Mr. Donohue is the one who conducted the test, did the analysis and prepared the report. His report is hearsay.
. . . .
[DEFENSE COUNSEL]: But if her testimony is confirming an opinion that I would argue is inadmissible, then the basis of her testimony is hearsay.
The trial court overruled the objection and allowed analyst Moeykens to testify about the DNA results.
Defendant argues that the laboratory report and Moeykens' testimony about the report was testimonial hearsay and admitted in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution. See U.S. Const. amend. VI. However, the State asserts that defendant's argument is not properly before this Court because defendant objected to Moeykens' testimony at trial only on the basis of hearsay. We agree with the State's position.
It is well-established that our appellate courts only will review constitutional questions raised and passed upon at trial. State v. Hunter, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982); N.C. R. App. P. 10(b)(1) (2007). In State v. Chapman, 359 N.C. 328, 611 S.E.2d 794 (2005), our Supreme Court refused to review a defendant's Sixth Amendment challenge to testimony offered by a police officer because the defendant had failed to object on constitutional grounds to its admission at trial. See Chapman, 359 N.C. at 360, 611 S.E.2d 794 at 819. Furthermore, our Supreme Court has held that "[t]he constitutional right of an accused to be confronted by the witnesses against him is a personal privilege which he may waive expressly or by a failure to assert it in apt time . . . ." State v. Braswell, 312 N.C. 553, 558, 324 S.E.2d 241, 246 (1985) (emphasis omitted). Defendant failed to object at trial on constitutional grounds and therefore has waived review of the issue by this Court.
Next, defendant contends that the trial court erred in denying his motion for a mistrial when Detective Brandon testified with respect to the content of the fingerprint cards prepared by Investigator Sarpy. We disagree.
"Whether a motion for mistrial should be granted is a matter which rests within the sound discretion of the trial court, and a mistrial is appropriate only when there are such serious improprieties as would make it impossible to achieve a fair and impartial verdict under the law." State v. Black, 328 N.C. 191, 200, 400 S.E.2d 398, 403 (1991) (citation omitted). "When the trial court withdraws incompetent evidence and instructs the jury not to consider it, any prejudice is ordinarily cured." Black, 328 N.C. at 200, 400 S.E.2d at 404.
The following exchange took place between the prosecutor and Detective Brandon regarding Investigator Sarpy's results from processing the crime scene:
Q. And how did you become aware of any results that she had from those areas?
A. As she neared completion of her processing the door, she advised me that she had 
[DEFENSE COUNSEL]: Objection.
THE COURT: Sustained.
Q. You can't  obviously you can't say what she said.
A. Right.
Q. Did you make any observations in the areas yourself?
A. I did. I looked at the cards that she had lifted. She had processed with the black powder and then lifted those prints, some smudges, some prints, and she would put them on white cards. And then she would also write on the white cards at what location that print came from on the door. Whatever she would process she would give the location of, and I did observe the cards that she had and some of the prints.
Q. And were you observing those cards while you were still on the scene out there?
A. Yes, I did.
Q. And let me tender to you what's been marked as State's Exhibits 13, 14 and 15 for identification. Just looking at those cards are you able to determine if those are cards that you saw there at the scene?
A. Yes, they are. These would be the lifts that they were taken from and then she described where the lifts came from on the door itself.
[DEFENSE COUNSEL]: Objection, your Honor.
THE COURT: Sustained.
[DEFENSE COUNSEL]: Jesus.
THE COURT: Disregard the last answer, Ladies and Gentlemen. Disregard his last answer, Ladies and Gentlemen.
[DEFENSE COUNSEL]: Your Honor, if I can be heard.
Out of the presence of the jury, defense counsel moved for a mistrial. The trial court denied the motion. Defendant argues that Detective Brandon's testimony regarding the content of the fingerprint cards and the location of where the prints were taken was prejudicial and required a mistrial.
We find no abuse of discretion by the trial court. The court sustained defendant's objection and instructed the jury to disregard the Detective Brandon's last answer. "`Jurors are presumed to follow a trial judge's instructions.'" State v. Phillips, 171 N.C. App. 622, 629, 615 S.E.2d 382, 386 (2005) (quoting State v. Taylor, 340 N.C. 52, 64, 455 S.E.2d 859, 866 (1995)), disc. rev. denied and appeal dismissed, 360 N.C. 74, 622 S.E.2d 628 (2005). Upon review, we hold that the trial court's actions were sufficient to cure any prejudice to defendant in the case sub judice. This assignment of error is overruled. For the foregoing reasons, we hold no error.
No error.
Judges ROBERT C. HUNTER, and STEELMAN concur.
Report per Rule 30(e).