An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1459

NORTH CAROLINA COURT OF APPEALS

Filed: 19 August 2014

STATE OF NORTH CAROLINA

v.

DEANDRE GRAHAM

Durham County
Nos. 11 CRS 55324, 55331

Appeal by defendant from judgments entered 24 July 2013 by Judge Carl Fox in Durham County Superior Court. Heard in the Court of Appeals 4 August 2014.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Aimee Escueta Margolis, for the State.*
>
> *Reece & Reece, by Michael J. Reece for defendant-appellant.*

ERVIN, Judge.

Defendant Deandre Graham appeals from judgments imposing active sentences of imprisonment upon him based upon his convictions for assault with a deadly weapon inflicting serious injury, robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, and possession of a firearm by a convicted felon. On appeal, Defendant contends that the trial court committed plain error by allowing the admission of

evidence that the victim had heard "on the street" that Defendant was one of the individuals who had assaulted and robbed him and that he is entitled to relief from his convictions on ineffective assistance of counsel grounds in light of the failure of his trial counsel to object to the admission of the victim's testimony to the effect that he had heard "on the street" that Defendant was the individual who had robbed him, to request the trial court to deliver an appropriate limiting instruction applicable to that testimony, and asking the alleged victim additional questions about this subject on cross-examination. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

After working all day on 14 May 2011, Terence Clay stopped by his girlfriend's apartment before meeting some friends at a bar at 1:00 a.m. After leaving the bar at approximately 2:30 a.m., Mr. Clay drove to a McDonald's restaurant to get something to eat before returning to his girlfriend's apartment. As he left the restaurant, he noticed a Jeep Cherokee with tinted windows following him. The Jeep Cherokee was still behind him

when he reached the parking lot associated with his girlfriend's apartment complex.

As Mr. Clay backed his car into a parking space, the Jeep Cherokee "rode in front of [him] and went out [of] the parking lot and made a right onto the main road." Two men, both of whom brandished handguns, emerged from the Jeep Cherokee and ran toward him. One of the men, whom Mr. Clay later identified as Defendant, confronted Mr. Clay at his open car door while the second man waited by the trunk. As he stood "[d]irectly in front of" Mr. Clay at a distance of about an arm's length, Defendant "kept saying, 'we want this car, give us this car, we want this car.'" In light of this set of circumstances, Mr. Clay surrendered his car keys, wallet, and phone.

After obtaining control of Mr. Clay's car keys, wallet, and phone, Defendant struck Mr. Clay twice in the head with the gun before shooting him as he lay on the ground. As a result of the fact that his assailant was having difficulty starting the car, Mr. Clay had to tell him how to do that. At about the time that his assailant managed to get the car started, Mr. Clay saw the second armed man "r[u]n back up the sidewalk and g[e]t in the truck[,]" which drove away from the apartment complex along with Mr. Clay's vehicle.

Mr. Clay remained on the ground until the armed men left. After their departure, Mr. Clay walked to his girlfriend's apartment and told her to call the police. At the time that he talked with investigating officers, Mr. Clay did not appear to be impaired. Paramedics transported Mr. Clay to the hospital, where he remained for two weeks. At the hospital, attending physicians removed portions of Mr. Clay's large and small intestines and liver that had been damaged as the result of the gunshot wound that had been inflicted upon him.

Mr. Clay, who is six feet tall, told investigating officers that the individual who shot him was "[s]horter than me" and had "dark skin with a close cut" and that he would be able to identify the person if he saw him again. Mr. Clay described the second armed individual as "tall, slender[ly] buil[t], and [having] single plaits." Although Mr. Clay believed he would also be able to identify the second armed individual if he saw him again, he acknowledged that he "got a better look at" the individual who shot him given that he had been closer to that person.[1]

After "asking around[,]" Mr. Clay viewed Defendant's photograph on Facebook and "immediately" recognized him as "[t]he guy that shot me." On 15 June 2011, Mr. Clay identified

---

[1]Mr. Clay later identified Marcus Wilder as the second assailant.

Defendant as the individual who had shot him after viewing a photographic array prepared by investigating officers. In addition, Mr. Clay positively identified Defendant in open court as the man who had stolen his car and shot him on 15 May 2011.

## B. Procedural History

On 16 June 2011, a warrant for arrest charging Defendant with possession of a firearm by a convicted felon, assault with a deadly weapon, and conspiring with Mr. Wilder to rob Mr. Clay using a dangerous weapon was issued. On 18 July 2011, the Durham County grand jury returned bills of indictment charging Defendant with robbery with a dangerous weapon, assault with a deadly weapon with the intent to kill inflicting serious injury, conspiring with Mr. Wilder to commit robbery with a dangerous weapon, and possession of a firearm by a convicted felon.

The charges against Defendant came on for trial before the trial court and a jury at the 22 July 2013 criminal session of the Durham County Superior Court. On 22 July 2013, the trial court allowed the State's motions to amend the conspiracy to commit robbery with a dangerous weapon and possession of a firearm by a convicted felon indictments to correct certain errors. On 24 July 2013, the jury returned verdicts convicting Defendant of robbery with a dangerous weapon, assault with a deadly weapon inflicting serious injury, conspiracy to commit

robbery with a dangerous weapon, and possession of a firearm by a convicted felon. At the conclusion of the ensuing sentencing hearing, the trial court entered judgments sentencing Defendant to a term of 97 to 126 months imprisonment based upon his consolidated convictions for robbery with a dangerous weapon and conspiracy to commit robbery with a dangerous weapon and to a consecutive term of 38 to 55 months imprisonment based upon his consolidated convictions for assault with a deadly weapon inflicting serious injury and possession of a firearm by a convicted felon. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Substantive Legal Analysis

### A. "Word on the Street" Evidence

In his first challenge to the trial court's judgment, Defendant contends that the trial court committed plain error by allowing Mr. Clay to testify that the "word on the street" indicated that one of his assailants was named "D-Block" or "Deandre Graham." More specifically, Defendant contends that the admission of evidence to the effect that "the 'word on the street'" indicated that Defendant had been one of Mr. Clay's assailants "was clearly hearsay." We do not find Defendant's argument persuasive.

As Defendant candidly concedes, he did not object at trial to the introduction of the evidence that he has challenged in this portion of his brief before this Court. As a result, we are limited to reviewing Defendant's challenge to the admission of the challenged evidence for "plain error." N.C.R. App. P. 10(a)(4) (stating that, "[i]n criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action in question is specifically and distinctly contended to amount to plain error").

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice — that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. . . . In other words, the inquiry is whether the defendant has shown that, absent the error, the jury probably would have returned a different verdict.

*State v. Carter*, 366 N.C. 496, 500, 739 S.E.2d 548, 551 (2013) (quotations omitted). We do not believe that the admission of the challenged evidence constituted error, much less plain error.

> The North Carolina Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the

> trial or hearing, offered in evidence to prove the truth of the matter asserted." However, out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay. This Court has held that statements of one person to another to explain subsequent actions taken by the person to whom the statement was made are admissible as nonhearsay evidence.

*State v. Call*, 349 N.C. 382, 409, 508 S.E.2d 496, 513 (1998) (quoting N.C. Gen. Stat. § 8C-1, Rule 801(c) (1988)). According to Mr. Clay, "[o]nce I got a name, I tried to put a name with the face. . . . I got, I guess, [the shooter's] government name, and I went on [F]acebook and tried to look him up." As soon as he saw Defendant's picture on Facebook, Mr. Clay "immediately" recognized him as "[t]he guy that shot me" and communicated that information to investigating officers. Thus, when considered in context, Mr. Clay's testimony to the effect that the "word on the street" indicated that Defendant had been one of his assailants was admissible, not for the purpose of showing the truth of the matter asserted, but to explain his decision to look at Defendant's photograph on Facebook. As a result, the trial court did not err by allowing the admission of Mr. Clay's testimony to the effect that "word on the street" indicated that Defendant had been one of his assailants.

### B. Ineffective Assistance of Counsel

Secondly, Defendant contends that he received constitutionally deficient representation from his trial counsel. More specifically, Defendant contends that the failure of his trial counsel to object to the admission of Mr. Clay's testimony that the "word on the street" indicated that Defendant was one of his assailants, to request an appropriate limiting instruction applicable to that testimony, and to ask Mr. Clay additional questions concerning this subject deprived him of his right to the effective assistance of counsel. Defendant is not entitled to relief on the basis of these contentions.

In reviewing allegations of ineffective assistance of counsel, this Court employs the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted for state constitutional purposes in *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). As a result, in order to assert a successful ineffective assistance of counsel claim, Defendant must show that (1) his counsel's performance fell "'below an objective standard of reasonableness[,]'" and (2) "there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Waring*, 364 N.C. 443, 502, 701 S.E.2d 615, 652 (2010) (quoting *Strickland*, 466 U.S. at 688, 694, 104 S. Ct. at 2064, 2068, 80

L. Ed. 2d at 693, 698), *cert denied*, __ U.S. __, 132 S. Ct. 132, 181 L. Ed. 2d 53 (2011).  We "need not determine whether counsel made errors if the record does not show a reasonable probability that a different verdict would have been reached in the absence of counsel's deficient performance."  *State v. Banks*, 163 N.C. App. 31, 36, 591 S.E.2d 917, 921 (citing *Braswell*, 312 N.C. at 563, 324 S.E.2d at 248-49), *disc. review denied*, 358 N.C. 377, 597 S.E.2d 767 (2004).

An ineffective assistance of counsel claim asserted on direct appeal, such as the claim at issue here, may "be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing."  *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001), *cert. denied*, 535 U.S. 1114, 122 S. Ct. 2332, 153 L. Ed. 2d 162 (2002).  As a result of our inability to see how further evidentiary development would in any way affect our evaluation of the validity of the ineffective assistance of counsel claim that Defendant has advanced in this case, we will proceed to address Defendant's ineffectiveness claim on the merits.

As noted above, the challenged testimony was admissible to explain Mr. Clay's decision to look at Defendant's picture on

Facebook and did not, for that reason, constitute inadmissible hearsay. *Call*, 349 N.C. at 409, 508 S.E.2d at 513. As a result of the fact that the failure to raise a futile objection does not reflect the provision of deficient representation and could not have prejudiced Defendant, Defendant cannot show that the failure of his trial counsel to object to the admission of Mr. Clay's testimony to the effect that the "word on the street" indicated that Defendant had been one of his assailants satisfies either prong of the *Strickland* test.

Assuming, without in any way deciding, that Defendant's trial counsel should have requested that the trial court deliver a limiting instruction directing the jury to refrain from considering Mr. Clay's testimony that "the word on the street" indicated that Defendant had been involved in robbing and assaulting him for the truth of the matter asserted, we do not believe that there is any reasonable probability that the delivery of such an instruction would have had any impact on the jury's decision to return guilty verdicts in this case. As we have already noted, Mr. Clay positively identified Defendant as one of his assailants when he looked at his photograph on Defendant's Facebook page, when he examined a photographic array presented to him by investigating officers, and in open court at trial. Although the record establishes that Mr. Clay had worked

for eleven hours during the day before the assault and robbery occurred, that he had consumed marijuana and alcoholic beverages earlier in the evening, that there were inconsistences in Mr. Clay's descriptions of the vehicle driven by his assailants in his pretrial statements to investigating officers and his trial testimony, and that Mr. Clay's description of his assailant's height differed from Defendant's actual height by several inches, we do not believe that the existence of these latent questions about the credibility of Mr. Clay's testimony suffices to substantially undercut the strength of the State's case against Defendant given the consistency and clarity of his identification testimony. As a result, we do not believe that there is any reasonable probability that the outcome at Defendant's trial would have been more favorable to Defendant had his trial counsel requested the delivery of an instruction precluding the jury from considering Defendant's testimony concerning what he heard "on the street" for substantive purposes.

Finally, we are not persuaded that the decision made by Defendant's trial counsel to question Mr. Clay about what he heard "on the street" about Defendant's involvement in the assault and robbery prejudiced Defendant. On cross-examination, Mr. Clay testified that he talked to a lot of people as part of

his effort to ascertain the identity of his assailants, that the information that Defendant was one of his assailants came from people that he trusted, and that he was not satisfied that Defendant was one of his assailants until he saw Defendant's photograph on Facebook. The apparent purpose of the cross-examination questions of which Defendant now complains was to suggest that, instead of having identified Defendant as one of the perpetrators of the robbery and assault, Mr. Clay was merely reciting what he heard "on the street." We are at something of a loss to determine how the decision of Defendant's trial counsel to ask this line of questions materially harmed Defendant's chances for a more favorable outcome at trial. At a minimum, given that the jury properly heard Mr. Clay testify concerning what he heard about Defendant's involvement in the robbery and assault "on the street" and given the fact that Mr. Clay identified Defendant as one of the individuals who assaulted and robbed him at the time that he looked at Defendant's Facebook page, when he examined the photographic array presented to him by investigating officers, and in open court, we cannot conclude that there is any reasonable probability that the jury would have returned verdicts that were more favorable to Defendant had his trial counsel refrained from asking Mr. Clay additional questions about what he had heard "on

the street." As a result, Defendant is not entitled to any relief from the trial court's judgments on the basis of any aspect of the ineffective assistance of counsel claim that he has asserted in this case.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgments have any merit. As a result, the trial court's judgments should, and hereby are, allowed to remain undisturbed.

NO ERROR.

Judges Robert C. HUNTER and STEPHENS concur.

Report per Rule 30(e).